## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MICHIGAN DEMOCRATIC PARTY,

                Plaintiff,

    v.

MICHIGAN REPUBLICAN PARTY,
DONALD J. TRUMP FOR
PRESIDENT, INC., ROGER J. STONE,
JR., and STOP THE STEAL INC.,

                Defendants.

Hon.

Case No. _____

## VOTER INTIMIDATION COMPLAINT PURSUANT TO THE
## VOTING RIGHTS ACT OF 1965 AND THE KU KLUX KLAN
## ACT OF 1871 FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Michigan Democratic Party hereby alleges as follows:

### INTRODUCTION

1.    The campaign of Donald J. Trump ("Trump Campaign"), Trump's close advisor Roger J. Stone, Jr., Stone's organization Stop the Steal Inc., the Michigan Republican Party ("MRP"), and others are conspiring to threaten, intimidate, and thereby prevent minority voters in urban neighborhoods from voting in the 2016 election. The presently stated goal of the Trump Campaign, as explained by an unnamed official to Bloomberg News on October 27, 2016, is to

1

depress voter turnout—in the official's words: "We have three major voter suppression operations under way" that target African Americans and other groups of voters. It has also become clear in recent weeks that Trump has sought to advance his campaign's goal of "voter suppression" by using the loudest microphone in the nation to implore his supporters to engage in unlawful intimidation at Michigan polling places.   Trump's exhortations have been amplified by direct and tacit assistance from the MRP and Stone, who helped pioneer similar tactics in the 1980s before those efforts were blocked by the federal courts.  Defendants have sought to organize, fund, and assist Trump's supporters to carry out the Trump Campaign's goals.  And Trump's supporters have responded with pledges to descend upon polling places in "certain areas" where many minority voters live in order to interfere with their efforts to exercise the franchise.

2.     In the aftermath of previous voter suppression efforts in our history, Congress responded forcefully by enacting laws that unequivocally prohibit voter intimidation.   In the 1870s, in response to threats of political violence and harassment against former slaves and their white supporters by the newly formed Ku Klux Klan, Congress banned private conspiracies to intimidate or threaten voters.  In the 1960s, in response to the menacing of African Americans who sought their full rights at the ballot box, Congress prohibited any threats or intimidation against any and all persons engaged in the democratic process.

2

Through these actions, Congress created tools in federal law to ensure that our elections will be free from harassment and intimidation at the polls.

3.      Voter intimidation is especially pernicious when it is condoned or encouraged by a candidate or political party.  The Republican National Committee ("RNC") recognized the dangers and illegality of party-sponsored efforts to intimidate voters in resolving a 1981 lawsuit alleging that it "enlisted the help of off-duty sheriffs and police officers to intimidate voters by standing at polling places in minority precincts during voting with 'National Ballot Security Task Force' armbands" and visible firearms, in violation of the Voting Rights Act of 1965.  *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 196 (3d Cir. 2012).  In a 1982 Consent Decree settling that lawsuit, the RNC and the New Jersey Republican State Committee agreed, *inter alia*, to:

> a. "as a first resort, use established statutory procedures for challenging unqualified voters";
>
> b. "comply with all applicable state and federal laws protecting the rights of duly qualified citizens to vote for the candidate(s) of their choice";
>
> c. "refrain from giving any directions to or permitting their employees to campaign within restricted polling areas or to

3

interrogate prospective voters as to their qualifications to vote prior to their entry to a polling place";

d. "refrain from undertaking any ballot security activities in polling places or election districts where the racial or ethnic composition of such districts is a factor in the decision to conduct, or the actual conduct of, such activities there and where a purpose or significant effect of such activities is to deter qualified voters from voting"; and

e. "refrain from having private personnel deputized as law enforcement personnel in connection with ballot security activities."

*Id.* at 196-97 (internal citations and quotation marks omitted).

4. The Consent Decree has been updated, affirmed against challenge, and enforced by several courts, including the U.S. Court of Appeals for the Third Circuit. *See id.* at 220. In rejecting the RNC's 2009 request that the Consent Decree be set aside, the District Court for the District of New Jersey held that "[v]oter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater danger to the integrity of that process than the type of voter fraud the RNC is prevented from addressing by the Decree." *Democratic Nat'l Comm. v. Republican Nat'l Comm.*,

671 F. Supp. 2d 575, 578-79 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012).  On October 26, 2016, citing the RNC's coordination with the Trump Campaign's voter intimidation efforts, the Democratic National Committee moved to hold the RNC in contempt for violating the Consent Decree.  *See Democratic Nat'l Comm. v. Republican Nat'l Comm.*, No. 81-cv-3876 (JMV), Dkt. No. 95 (D.N.J. Oct. 26, 2016).

5.      In this action, Plaintiff alleges Defendants' coordinated campaign of vigilante voter intimidation also violates the Ku Klux Klan Act of 1871 and the Voting Rights Act of 1965.

6.      There are only 5 days left until Election Day.  Trump's calls for unlawful intimidation have grown louder and louder, and the conspiracy to harass and threaten voters on Election Day already has resulted in numerous acts that threaten the voting rights of registered Michigan voters.  The Michigan Democratic Party, and untold numbers of Michigan voters, will suffer irreparable harm if the right to vote is imperiled by the same forms of virulent harassment that federal law has prohibited since shortly after the Civil War.

## PARTIES

7.      Plaintiff Michigan Democratic Party is a state party organization affiliated with the Democratic Party, headquartered in Lansing, Michigan.  *See*

http://www.michigandems.com/. It is working to elect Secretary Hillary Rodham Clinton for President and other "Democrats across the state." *Id.*

8. Defendant Michigan Republican Party ("MRP") is a political organization and a Michigan limited liability company affiliated with the Republican Party with its principal place of business in Lansing, Michigan. *See* https://www.migop.org/. The MRP is working to elect Donald J. Trump as President of the United States. *See* https://www.migop.org/about/our-candidates.

9. Defendant Roger J. Stone, Jr., is a resident of Florida. Stone is a Republican political operative and longtime associate of Trump's. He is currently an operative for Trump and his campaign. Stone is a vocal proselytizer of Trump's false voter fraud claims and his calls for vigilante action, including through Stone's "super PAC" Stop the Steal Inc., its website stopthesteal.org, and many forms of social media. Stone has encouraged Trump supporters to wear red shirts on Election Day, in order to menace voters. Stone was a key advisor to the 1981 campaign of former New Jersey Governor Thomas Kean, in which a "ballot security" force wearing black armbands engaged in widespread voter intimidation in Democratic areas of the state, leading to a nationwide federal consent decree barring supposed ballot security efforts by the Republican Party.

10. Defendant Stop the Steal Inc. is a "super PAC" formed by Stone on April 6, 2016, under Section 527 of the Internal Revenue Code. Stop the Steal Inc.

6

is devoted to promoting Stone's conspiracy theories regarding voter fraud, and to using fears of a "rigged" election to organize and recruit poll watchers to harass and intimidate perceived Democratic voters on Election Day.  Stop the Steal Inc. is headquartered at 3843 South Bristol Street, Suite 312, Santa Ana, California.

11.    Defendant Donald J. Trump for President, Inc. (the "Trump Campaign") is the campaign of Donald J. Trump for the presidency of the United States.  The Trump Campaign is headquartered at 725 Fifth Avenue, New York, New York.

## JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.SC. 1343 (3) and (4) because this action arises under federal law, specifically Section 2 of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), and Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b).

13.    Specific personal jurisdiction exists over the Trump Campaign, Stone, and Stop the Steal Inc., because they are transacting or transacted business in Michigan, and/or have caused or will cause tortious acts to be done, or consequences to occur, in Michigan.  Mich. Comp. Laws §§ 600.705, 600.715; *see, e.g.*, *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 888-889 (6th Cir. 2002).  Defendants purposefully directed their activities toward Michigan, this

Complaint relates to Defendants' Michigan-related activities, and jurisdiction here is reasonable. *See id.*

14.    The Michigan Democratic Party has standing in this action because it is supporting many candidates for office in the election to be held on November 8, 2016, including Democratic candidates in the Presidential, Senate, House, and numerous statewide elections.    The Party is threatened with immediate and irreparable injury if the vigilante voter intimidation campaign by Trump, Stone, and their co-conspirators succeeds in disrupting or changing the results of the election by means of an unlawful conspiracy.    The Michigan Democratic Party has associational standing on behalf of itself and its supporters.

15.    Venue is proper in this district under 28 U.S.C. § 1391(a) and (c) because significant events giving rise to this action occurred in this district.

16.    The allegations herein justify injunctive relief in order to prevent irreparable harm.    An injunction against the Trump Campaign and its co-conspirators' planned intimidation tactics is the only way to protect thousands of Michigan voters from harassment, threats, or intimidation that could discourage them from voting in the upcoming election.

## FACTUAL ALLEGATIONS

## I.   CONGRESS REGULATES VOTER INTIMIDATION FOR OVER A CENTURY IN RESPONSE TO POLLING PLACE VIGILANTISM

17.   The Ku Klux Klan Act of 1871 (the "Klan Act") was the last of the Enforcement Acts—legislation passed during Reconstruction to protect the suffrage rights of newly freed slaves, including by protecting them and their supporters from violence and harassment.  President Grant requested the legislation in order to empower him to stamp out the first generation of the Ku Klux Klan, which Congress granted within a month of the request.

18.   The Klan Act, as currently codified in 42 U.S.C. § 1985(3), provides for damages and equitable relief "if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of . . . an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy."  The Act further provides that an action will lie against the conspirators so long as "one or more persons engaged" in the conspiracy "do, or cause to be done, any act in furtherance of the object of such conspiracy."  As the Supreme Court made clear in *Ex parte Yarbrough*, 110 U.S. 651 (1884), the constitutional basis for this broad provision—whose text requires no showing of racial intent or

9

animus, only a conspiracy to intimidate voters—is the Constitution's Elections Clause.

19.     Nearly a century later, in 1965, Congress again invoked its broad Elections Clause power to protect the franchise.   Responding to numerous instances of intimidation in both elections and registration efforts in the Jim Crow South, including the killing of black and white activists seeking to register African Americans to vote, Congress passed Section 11(b) of the Voting Rights Act. Section 11(b) prohibits actual or attempted "intimidation," "threats," or "coercion" against a person, either "for voting or attempting to vote" or "for urging or aiding any person to vote or attempt to vote."   Section 11(b) authorizes private suits against private actors, even in the absence of any action by a state or state official.

20.     Congress has thus enacted two broad statutes to prevent voter intimidation.  As courts have made clear, it violates Section 11(b) to follow voters around, stand behind them taking notes, follow them into the parking lot, or loudly discuss voter fraud laws in their presence. *See, e.g.*, Temporary Restraining Order, *Daschle v. Thune*, No. 04-cv-4177, Dkt. No. 6 (D.S.D. Nov. 2, 2004) (entering a Temporary Restraining Order prohibiting a Republican Senate candidate and his supporters from continuing to "follow[] Native Americans from the polling places," "copy the license plates of Native Americans driving to the polling places" and record "the license plates of Native Americans driving away from the polling

places"). Invasions of physical space and intimations of possible future violence, prosecution, or legal action based on a voter's presence at the polls constitute unlawful voter intimidation. And even as to those persons who do not directly participate in those activities, the Klan Act makes it unlawful to conspire with others to promote, organize, and facilitate those efforts.

## II.     TRUMP AND STONE ISSUE A CALL TO INTIMIDATE VOTERS IN THE 2016 ELECTION ON THE BASIS OF BOGUS CLAIMS OF VOTER FRAUD

21.     In the months leading up to the 2016 election, Trump has made an escalating series of statements, often racially tinged, suggesting that his supporters should go to particular precincts on Election Day and intimidate voters— intimating that otherwise, he will lose the election because of imagined voter fraud. It does not matter that voter fraud is practically nonexistent. That reality has not stopped Trump from telling his supports that certain people, in certain precincts, will vote "15 times" for Secretary Clinton.

22.     For example, Trump told a crowd in Altoona, Pennsylvania, in August 2016 that:

> "I hope you people can . . . not just vote on the 8th, [but also] go around and look and watch other polling places and make sure that it's 100-percent fine. We're going to watch Pennsylvania—go down to certain areas and watch and study—[and] make sure other people don't come in and vote five times. . . . The only way we can lose, in my opinion—and I really mean this, Pennsylvania—is if cheating goes on."

11

23. Ten days later, at a speech in Ohio, Trump explained that he did not just mean that supporters should "watch":

> "You've got to get everybody to go out and watch, and go out and vote," Trump said. "And when [I] say 'watch,' you know what I'm talking about, right?"

Trump has explained that his "watchers" should act in a capacity similar to law enforcement, even though they will not in fact be acting in a law-enforcement capacity. In other words, Trump is encouraging his supporters to act as vigilantes.

24. In the midst of these comments, the Trump Campaign rolled out a form on its website for supporters to sign up to be "Trump Election Observers" in order to "Stop Crooked Hillary From Rigging This Election," further encouraging his supporters to join in a common plan to "watch" voters in "certain areas" of states like Michigan for voter fraud.

25. Trump has specifically encouraged his supporters who work in law enforcement to use their official authority to assist in "watching" Democratic-leaning communities. For example, he stated at the Altoona rally in August 2016 that to protect against supposed voter fraud, "[w]e have to call up law enforcement" and "we have to have the sheriffs and the police chiefs and everybody watching."

26. Trump's exhortations have grown more ominous and specific as the election draws closer. At an October 1, 2016 rally in Manheim, Pennsylvania, for

example, Trump instructed his supporters to "go check out [other] areas because a lot of bad things happen, and we don't want to lose for that reason."  Trump and Trump Campaign surrogates like former New York City Mayor Rudy Giuliani have told supporters that voters of color should be suspected of fraud.  Trump has suggested that Latino voters are undocumented immigrants whom the federal government has allowed to "pour into this country" specifically to vote in the election.  And Trump's closest advisors – who are prominent Trump Campaign surrogates – have echoed Trump's statements, asserting that urban voters routinely commit voter fraud in cities like Detroit, and that the only way Trump will lose is if the election is "rigged."  For example, in a nationally televised interview on October 16, 2016, former Trump surrogate Rudy Giuliani expressed that voter fraud is concentrated in predominantly minority communities in "inner cities" that support "Democrats," like "Philadelphia and Chicago."

27.    While speaking in Ambridge, Pennsylvania, on October 11, 2016, Trump warned that it is "[s]o important that you watch other communities"— which, he clarified, meant Philadelphia—"because we don't want this election stolen from us . . . .  And everybody knows what I'm talking about."  Trump was referring in particular to stories he had circulated earlier in the summer about Philadelphia precincts comprised nearly exclusively of African-American voters in which Mitt Romney received no votes in 2012.  At that same rally, a prominent

13

Trump supporter, U.S. Representative Bill Shuster, made clear that Trump supporters should focus their voter intimidation in Philadelphia, stating:   "The people in Western and Central Pennsylvania have to overcome what goes on down in Philadelphia—the cheating."   Another prominent Trump supporter, former Speaker of the House Newt Gingrich, has similarly stated that the election might be "stolen" because of voter fraud in Philadelphia and other Democratic-leaning communities:

> "You look at Philadelphia, you look at St. Louis, you look at Chicago, I mean, again, I'm old enough, I remember when Richard Nixon had the election stolen in 1960 . . . . So to suggest that we have—that you don't have theft in Philadelphia is to deny reality."

28.     Trump now asserts at rallies that the presence of fraud at the polls will prevent him from winning the November 8 election.   His comments are consistently directed at Democratic-leaning communities with large minority populations in states like Michigan, Ohio, and Pennsylvania.  For example, at an October 18 rally in Colorado Springs, Colorado, Trump warned his supporters about voter fraud:

> "[T]ake a look at Philadelphia, what's been going on, take a look at Chicago, take a look at St. Louis.  Take a look at some of these cities, where you see things happening that are horrendous."

29.     At an October 20, 2016 rally in Delaware, Ohio, Trump told the crowd that Secretary Clinton is "truly capable of anything, including voter fraud." At the same rally, Trump repeated what he called "terrible, frightening statistics"

(which also happen to be false), like the claim that "fourteen percent of non-citizens are registered to vote," or that:

> "1.8 million people are dead, but they're registered to vote, some of whom voted even though they're dead.  Which is really a hard thing to do.  But it's easy, if fraud is involved. . . .  One was a Republican, and after death, became a Democrat.  It's true!"

30.    At an October 17, 2016 rally in Ohio, Governor Pence urged Trump supporters to sign up to be poll watchers to combat purported voter fraud, claiming that the media is trying to "rig" this election "with their biased coverage." Pence explained that any Trump supporter who has not volunteered to participate to provide "accountability at a polling place" has not "yet done all that you can do."

31.    At a rally in Golden, Colorado on October 29, 2016, Trump accused postal workers of throwing out ballots that they don't "like."   Trump told the crowd,

> "I have real problems with ballots being sent.  Does that make sense?  Like people saying, 'Oh here's a ballot,' being, 'here's another ballot - throw it away, throw it away.  Oh, here's one I like, we'll keep that one.  I have real problems—so get your ballots in. We're trying to have some pretty good supervision out there.  We got a lot of people watching you people that collect the ballots.  We got a lot of people watching the people that collect the ballots.  Now, the, you know, dishonest media will say 'oh, that wasn't nice.  Everything is so honest.  Everything in our country –'  We have 1.8 million people that are dead registered to vote.  Right?  And some of them vote.  I wonder how that happens.  We have 2.7 million people on more than one state, they're registered two states, and sometimes more than that. And I could go on and on and on."

32.     Defendant Stone has amplified Trump's message.  Stone is a far-right-wing political operative who has served as a close advisor to Trump throughout his run for President.  Stone has a history of engaging in voter intimidation, racist and misogynist hate speech, and incitement to violence.  Stone has publicly called for the execution of Secretary Clinton, Senator Bernie Sanders, and George Soros, among others.  He has referred to Herman Cain as a "mandingo," to former presidential candidate Ben Carson as an "Uncle Tom," and Representative Allen West as an "arrogant know-it-all negro."  He is also the peddler of numerous widely discredited conspiracy theories, just a few of which include that the Bush family tried to assassinate President Reagan, that President Lyndon Johnson orchestrated the assassination of President John F. Kennedy, and that Senator Ted Cruz's father was tied to the Kennedy assassination.

33.     Through his super PAC Stop the Steal, Stone is currently running a website called "StopTheSteal.org," which is actively signing up Trump supporters to "volunteer" to fight "voter fraud."  #StopTheSteal is a popular hashtag among Trump supporters on Twitter, and Stone's group maintains an active Facebook presence.  Stone and his associates, including Stop the Steal Inc., have also widely disseminated messages via websites such as stopthesteal.org and through social media under hashtags such as #StopTheSteal, falsely claiming that Secretary Clinton rigs elections.  One image states: "HILLARY CLINTON CHEATED

AND STOLE THE PRIMARY FROM BERNIE . . . WE THE PEOPLE CAN STOP HER FROM STEALING THE GENERAL." Another states that "25% of Votes needed to win, is decided by illegals" and that hundreds of "electoral votes [are] at RISK of being RIGGED." Through these and other messages, Stone has sought to encourage Trump supporters to engage in unlawful voter intimidation.

34. Stone is also using social media to promote the common plan that Trump supporters—and particularly those who have agreed to engage in vigilante "ballot security" efforts—wear red shirts on Election Day.

35. Further, Stone and Stop the Steal Inc. are actively recruiting Trump supporters for "exit polling," specifically targeting nine Democratic-leaning cities with large minority populations, including Detroit. Oliver Laughland and Sam Thielman, *Trump Loyalists Plan Own Exit Poll Amid Claims of 'Rigged' Election*, The Guardian, Oct. 20, 2016. As of November 3, 2016, Stone claimed to have organized 2,883 volunteers to engage in this "exit polling" operation. That number includes volunteers signed up to participate throughout Michigan, with dozens statewide. Stone's purported polling exercise serves no legitimate purpose. Stone does not run a polling business, and effective "exit polling" does not focus merely on Democratic-leaning or majority-minority districts–rather, legitimate exit polling ordinarily focuses on competitive districts rather than areas that vote overwhelmingly for one party. Stone's "exit polling" activities appear to be aimed

chiefly at majority-minority communities, such as certain majority-minority areas in Michigan, with the purpose or effect of intimidating non-white persons and Democrats from voting.

36.    Through an organization called "Vote Protectors," Stone has also recruited volunteers to watch polling places.  The Vote Protectors website permits any volunteer to download and print official-looking identification badges, and provides scripts for volunteers that instruct them on how to interrogate voters on Election Day.  Stone's operation is not a legitimate exit poll.  Instead, volunteers are permitted to tally up votes on the Vote Protectors website—for Trump or any other candidate—without any proof that they had spoken to voters or visited a polling site.  Vote Protectors and Stop the Steal discontinued some, but not all, of these practices after they were exposed by a national media outlet.

37.    The notion of widespread voter fraud in modern American politics is itself a myth.  *See generally* Lorraine C. Minnite, *The Myth of Voter Fraud* (2010) (concluding that the notion of widespread voter fraud is a "myth").  One 2014 study found that only 241 potentially fraudulent ballots had been cast nationwide over a fourteen-year period—*out of 1 billion ballots cast*.

38.    Those statistics help explain why the courts that have examined the evidence have concluded that widespread voter fraud does not exist.  In a challenge to Pennsylvania's voter ID law, for example, "[t]he parties [we]re not aware of any

incidents of in-person voter fraud in Pennsylvania and d[id] not have direct personal knowledge of in person voter fraud elsewhere." *Applewhite v. Commonwealth*, No. 330 M.D. 2012, 2014 WL 184988, at *57 (Pa. Commw. Ct. Jan. 17, 2014).  A federal judge in North Dakota recently determined that "[t]he undisputed evidence before the Court reveals that voter fraud in North Dakota has been virtually non-existent."  *Brakebill v. Jaeger*, No. 16-cv-00008 (DLH), Dkt. No. 50 (D.N.D. Aug. 1, 2016).   A federal judge in Wisconsin has similarly observed that "[t]he Wisconsin experience demonstrates that a preoccupation with mostly phantom election fraud leads to real incidents of disenfranchisement, which undermine rather than enhance confidence in elections, particularly in minority communities." *One Wis. Inst. v. Thomsen*, No. 15-cv-324 (JDP), 2016 WL 4059222, at *2 (W.D. Wis. July 29, 2016); *see also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 194 (2008) ("The only kind of voter fraud that SEA 483 addresses is in-person voter impersonation at polling places.  The record contains no evidence of any such fraud actually occurring in Indiana at any time in its history."); *Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016) ("[T]he evidence before the Legislature was that in-person voting, the only concern addressed by SB 14, yielded only two convictions for in-person voter impersonation fraud out of 20 million votes cast in the decade leading up to SB 14's passage."); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014)

("North Carolina asserts goals of electoral integrity and fraud prevention.  But nothing in the district court's portrayal of the facts suggests that those are anything other than merely imaginable."); *Frank v. Walker*, 17 F. Supp. 3d 837, 848 (E.D. Wis. 2014) ("[I]t appears that there have been zero incidents of in-person voter-impersonation fraud in Wisconsin during recent elections."), *rev'd on other grounds*, 768 F.3d 744 (7th Cir. 2014); *Lee v. Va. State Bd. of Elections*, No. 3:15-cv-357-HEH, 2016 WL 2946181, at *23 (E.D. Va. May 19, 2016) ("evidence of actual voter impersonation-type fraud was scant").

39.    The fact that widespread voter fraud is a myth does not prevent many people—particularly those who are listening most closely to the RNC, Trump, and their surrogates such as Stone—from believing it is real.  As a recent Washington Post-ABC poll showed, 69% of Trump's supporters (but less than half of all voters) believe that voter fraud happens "very often" or "somewhat often."  This widespread belief, despite a total lack of evidence to support it, has been stoked for decades by certain elements of the Republican Party, including Stone and Trump's allies in the so-called "alt-right" media ecosystem, such as the Breitbart website that was run until recently by Trump Campaign CEO Steve Bannon.  In the last few months alone, Breitbart has run dozens of articles on supposed voter fraud, with ominous headlines about "Obama forces" and "Soros-backed" cover-ups, and Stone has appeared on Breitbart-affiliated radio stations to echo Trump's

fearmongering about a stolen election. Stone's "StopTheSteal" campaign has fanned these flames by widely distributing via social media and elsewhere the false claim that the election will be "rigged" by "illegals." And, appearing on Face the Nation on October 23, 2016, RNC Chairman Reince Priebus declared that voter fraud "is real," and that what Trump is doing is "trying to also tell his folks to watch out for this fraud that might occur."

40.    Trump's calls for unlawful vigilantism to stop purported voter fraud advance a coordinated effort to harass and intimidate voters at the polls. Voter intimidation efforts aimed at suppressing minority voters have frequently been "ostensibly aimed at combatting voter fraud." *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-cv-896, 2016 WL 3166251, at *28 (S.D. Ohio June 7, 2016), *aff'd in part, rev'd in part on other grounds*, No. 16-3603, 2016 WL 4761326 (6th Cir. Sept. 13, 2016); *see also Veasey*, 830 F.3d at 237 ("[T]he record shows that Texas has a history of justifying voter suppression efforts such as the poll tax and literacy tests with the race-neutral reason of promoting ballot integrity."). As the New Jersey District Court held in rejecting the RNC's 2009 request to vacate the Consent Decree, "[v]oter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater danger to the integrity of that process than the type of voter fraud the

RNC is prevented from addressing by the Decree." *Democratic Nat'l Comm.*, 671 F. Supp. 2d at 578-79.

41.     Michigan itself has experienced a specific, recent history of efforts at vote suppression targeted at minority and non-Republican voters.  In the 2008 election cycle, the Democratic National Committee and others sued various national and Michigan Republican entities to prevent them "from implementing a mass challenge to the eligibility of voters who reside at properties that have appeared on lists of foreclosed properties," which amounted to "a new version of an old tactic" known as "caging."  Mot. for Prelim. Inj., *Maletski v. Macomb Cty. Republican Pty.*, No. 08-cv-13982 (E.D. Mich. filed Sept. 25, 2008), at 1, *available at* http://moritzlaw.osu.edu/electionlaw/litigation/documents/Maletski-Motion-9-25-08.pdf.  That litigation resulted in a settlement, in which the parties agreed "that the existence of a person's address on a foreclosure list does not provide a reasonable basis for challenging the person's eligibility to vote."  Settlement Agreement, *Maletski v. Macomb Cty. Republican Pty.*, No. 08-cv-13982 (E.D. Mich. Oct. 20, 2008), *available at* http://moritzlaw.osu.edu/electionlaw/litigation/documents/Maletski-Settlement.pdf.

42.     More recently, the Sixth Circuit Court of Appeals upheld an injunction against a 2016 Michigan law that would have outlawed the practice of straight-ticket voting that has been used in the state for over a Century.  *Michigan*

*State A. Philip Randolph Institute v. Johnson*, 833 F.3d 656 (6th Cir. 2016).  As the

Court of Appeals explained, the law "placed a burden on voters—particularly

African–American voters," in whose communities "straight-party voting is

prominent and where lines are often already long."  *Id.* at 659, 666.

### III. REPUBLICAN NATIONAL AND STATE COMMITTEES CONSPIRE WITH TRUMP AND STONE TO ENCOURAGE VOTER INTIMIDATION

43.    As the Republican Party nominee for President, Trump and his

campaign coordinate closely with the RNC and MRP on a wide variety of matters,

including overall campaign strategy, public messaging, voter outreach, and field

operations.  On May 17, 2016, the RNC created a joint fundraising committee with

the Trump Campaign specifically to fund the Trump Campaign and its operations,

and to elect Republicans "up and down the ballot."  The Trump Campaign has

"relinquished control over many of its tactical decisions" to the RNC.  Indeed,

shortly after Trump became the Republican nominee, the RNC met with the Trump

Campaign to discuss what they described as "the merger."  The Trump Campaign

and RNC "negotiated a partnership," in which the RNC "buil[t] assets and

infrastructure and the nominee gets to benefit from it."

44.    The Trump Campaign has decided largely to refrain from setting up a

parallel layer of offices in staff in Michigan and elsewhere, as past Republican

Party nominees have done.  Instead, as has been widely reported, the Trump

Campaign is relying predominantly on the RNC and Republican state party entities (here, the MRP) to manage get-out-the-vote operations in contested states such as Michigan.

45.     The Trump Campaign has made public statements indicating that its coordination with the RNC and MRP extends to efforts to monitor polling locations for purported voter fraud (although it is now trying to walk back the RNC-related aspects of these statements in the context of the ongoing RNC consent decree litigation).  Trump's running mate, Governor Mike Pence, publicly stated that the Trump Campaign is working with the RNC and state Republican parties on ballot security measures.  At an August 3, 2016, town hall rally in Denver, Colorado, Pence was asked "how is the Trump-Pence campaign going to . . . prevent" Secretary Clinton from "steal[ing] this election."  Pence responded:

> "I will tell you that the Trump campaign and the Republican National Committee are working very very closely with state governments and secretaries of states all over the country to ensure ballot integrity. . . .  We are working hard all over the country, the Republican National Committee is working all over the country, but I would encourage everyone within the sound of my voice, get involved, participate, be a poll worker on election day . . . be a part of that process, and uphold the integrity of one person one vote in America."

46.     The RNC has delegated "ballot security" initiatives to its agents in Michigan.  On September 30, 2016, Trump appeared at rally in Michigan and instructed his supporters to "go pick some other place and go sit there with your friends and make sure it's on the up and up. Because you know what, [voter fraud

is] a big, big problem in this country and nobody wants to talk about it."   Just ten days later, the chair of the MRP, who is also a member of the RNC and therefore its agent, announced a "massive statewide anti-voter fraud effort" to prevent Hillary Clinton from "stealing" the election from Trump.   According to an MRP spokesperson, this will include "roving poll watchers in places like Detroit."  The chair of the MRP recently submitted a declaration in the RNC consent decree litigation that, while denying coordination of "ballot security" efforts with the RNC, confirmed that "the Michigan GOP is engaged in poll watching and ballot security activities for this election," and that the MRP chair has disregarded the advice of the RNC General Counsel that RNC members such as the MRP chair are "encourage[d] not to engage in 'ballot security' activities even in your personal, state party, or campaign capacity."

47.    MRP-affiliated poll-watchers in Michigan are being trained that urban areas of Michigan, including places with higher concentrations of Democratic and minority voters, are more likely to involve voter fraud.  For example, one MRP regional field director has trained Republican poll watchers in Michigan that the party is "very well aware" that "Pontiac is higher voter fraud" than other parts of Oakland County, and that "[i]f you're in a place like Pontiac or Detroit or Warren, . . . that's a little nastier."   Poll-watchers are also being trained to focus on "challeng[ing] voters whose eligibility is suspect," and to prevent anyone from

getting in line to vote after 8:00 p.m. by "invit[ing] the precinct captain and any other party's challenger to identify the last person in line at closing time and affix a paper 'X' to the final voter's back."

48.     In other words, MRP and RNC agents in Michigan have responded directly to Trump's public comments by directing resources and personnel to Trump-focused "ballot security initiatives."   Such initiatives continue to be encouraged and bolstered by the Trump Campaign itself.   On October 17, 2016, Pence directed attendees at a Macomb County Republican Party event to "[m]ake sure you're out there standing with your neighbors and your friends to turn out the vote, and uphold the integrity of the vote, all across Michigan."   And on October 19, 2016, Trump's Michigan campaign director publicly fanned the flames of Trump's claims of likely widespread voter fraud, including in Michigan.

49.     Trump's campaign manager Kellyanne Conway recently confirmed that the Trump campaign is "actively working with" the RNC and other branches of the Republican Party apparatus, including the MRP, to "monitor precincts around the country."   (Although she too is now trying to walk away from the RNC aspect of these comments in the context of the RNC consent decree litigation.) The RNC and MRP have continued this close coordination even after Trump's widespread and racially charged pleas to his supporters to engage in voter

intimidation in areas like Detroit that are home to large communities of racial minorities.

50.     The Trump Campaign also recently distributed talking points to Republican Party surrogates directing that they "[m]ust make points on rigged system," and encouraging them to claim there has been "an increase in unlawful voting by illegal immigrants."

## IV.   CO-CONSPIRATORS RESPOND WITH PROMISES TO INTIMIDATE VOTERS

51.     The conspiracy reaches beyond the Defendants.  Trump's supporters in Michigan, and elsewhere, are responding to his calls to engage in voter intimidation, thereby creating an immediate threat of harm to Michigan voters.

52.     *Politico* reported on November 2, 2016 that, "[e]nergized by Trump's candidacy and alarmed by his warnings of a 'rigged election,' white nationalist, alt-right, and militia movement groups are planning to come out in full force" on Election Day.  According to that report, "Neo-Nazi leader Andrew Anglin plans to muster thousands of poll-watchers across all 50 states," and "his partners at the alt-right website 'the Right Stuff' are touting plans to set up hidden cameras at polling places in Philadelphia and hand out liquor and marijuana in the city's 'ghetto' on Election Day to induce residents to stay home."  Anglin wrote that he is "sending an army of Alt-Right nationalists to watch the polls" in "urban areas."  Anglin continued:  "We also will have stationary cameras hidden at polling locations in

27

Philadelphia . . . .   [W]e set up a hidden camera in the school cafeteria [used for polling.] "

53.     The *Boston Globe* has reported on Trump supporters who are planning to engage in unlawful voter intimidation, and who understand themselves to be doing so at Trump's behest:

> "Trump said to watch your precincts. I'm going to go, for sure," said Steve Webb, a 61-year-old carpenter from Fairfield, Ohio.
>
> "I'll look for . . . well, it's called racial profiling.  Mexicans.  Syrians. People who can't speak American," he said.  "I'm going to go right up behind them.  I'll do everything legally.  I want to see if they are accountable.  I'm not going to do anything illegal.  I'm going to make them a little bit nervous."

54.     Notwithstanding Mr. Webb's pledge not to do "anything illegal," the conduct in which he plans to engage on Trump's behalf—deliberately targeting of minority voters via "racial profiling" in order to "make them a little bit nervous" while they are attempting to vote—unequivocally violates Section 11(b) of the Voting Rights Act.  *See, e.g.*, Temporary Restraining Order, *Daschle*, No. 04-cv-4177, Dkt. No. 6.

55.     Similarly, Harry Miller, purportedly of Palm Beach, Florida, tweeted in response to Trump's calls for election observers that he would be "wear'n red at polls . . . .  We gonna be watch'n fer shenanigans . . . & haul ya away . . . ."  The tweet included a picture of a pickup truck with Florida plates and a person-sized cage built into the bed, surrounded by American flags.  Miller has over 20,000

Twitter followers and tweets almost exclusively about Trump, Secretary Clinton, and racially charged political themes such as deporting "Muzzys."  A typical tweet asserts that "Our Muzzy Commander in Chief" is "shov'n Sharia Law down our throats . . . & Crooked Hiltlery follow'n his every move. . . . "

56.    At a "poll watcher training" class for Trump supporters organized by the Republican Party of Virginia, would-be watchers expressed their belief that "there is going to be massive voter fraud, and it definitely will be to ensure Hillary Clinton wins."  The leader of the class listed purported voter-fraud schemes "orchestrated by liberal groups," including "civil rights leaders coercing severely disabled people into voting."  One Trump supporter seeking to be a poll watcher said her "biggest concern" was "[i]llegals voting," and noted as an example of said phenomenon that in 2012 she saw voters who did not appear to speak English.

57.    In Virginia, on October 13, 2016, two armed Trump supporters staged a purported "protest" in front of the office of a Virginia Democratic candidate for Congress, Jane Dittmar.  The armed Trump supporters, one of whom wore a signature Trump campaign hat, stood for nearly twelve hours outside Dittmar's campaign office, turning sideways so that those inside could see that they were carrying firearms.

58.    Trump supporters have also sought to sow misinformation among supporters of Secretary Clinton.  For example, Joshua Lorenz, a Republican City

Councilman from Murrysville, Pennsylvania, posted on Facebook an image with the phrase: "Vote Hillary November 8th" and "YOU CAN VOTE AT HOME COMFORTABLY ONLINE!" with instructions for how only Clinton supporters could purportedly vote online. Lorenz included with his post a statement: "More proof that the election process is rigged. Only Hillary supporters can vote from their smartphones or in the comfort of their own homes." A similar image being circulated online features a photo of Clinton and the statement: "Did you know? Pennsylvania now has online voting?" in a font that is similar to that used in official Clinton campaign advertising. Of course, these statements are false.

59.    Stone has participated directly in this misinformation campaign. On October 23, 2016, Stone sent out a (now deleted) message via his Twitter feed deliberately designed to mislead Democratic voters by representing—using Secretary Clinton's likeness and logo—that supporters can "VOTE the NEW way on Tues. Nov 8th" by texting "HILLARY to 8888," after which voters would apparently "receive official confirmation."

60.    All the while, Trump continues to induce his supporters to engage in polling place harassment targeting non-white voters in urban areas, and continues to invoke the baseless claim that the unlawful conduct that his supporters are planning, at his behest, is justified by fictitious "voter fraud."

30

## V.    DEFENDANTS' PLANNED ACTIONS ARE NEITHER LEGITIMATE NOR LAWFUL MEASURES TO PROTECT AGAINST VOTER FRAUD

61.    Trump's calls for his supporters to travel en masse outside their counties of residence and engage in vigilante voter intimidation bear no possible relationship to legitimate efforts to protect against voter fraud.  In fact, Trump has directed his supporters to engage in activity forbidden by Michigan state election law.

62.    Michigan law sets forth measures designed to protect the integrity of Michigan elections.  For example, Michigan law makes it unlawful, whether inside a polling place or within 100 feet of the entrance of a building with a polling place, to "solicit votes," Mich. Comp. Laws § 168.931(1)(k); to "persuade or endeavor to persuade a person to vote for or against any particular candidate or party ticket or for or against any ballot question that is being voted on at the election," Mich. Comp. Laws § 168.744; to "place or distribute stickers, other than stickers provided by the election officials pursuant to law," *id.*; to "solicit donations, gifts, contributions, purchase of tickets, or similar demands, or request or obtain signatures on petitions," *id.*; or to "post, display, or distribute . . . any material that directly or indirectly makes reference to an election, a candidate, or a ballot question" (other than official material required to be posted), *id.*

63.    Voter intimidation is a felony under Michigan law, Mich. Comp. Laws § 168.932(a), punishable by a prison sentence of up to five years, *id.* § 168.935.  Law enforcement officials have a duty under Michigan law to institute proceedings against those who violate this and other Michigan election law provisions. *Id.* § 168.941.

64.    Michigan does allow "any interested person" to observe elections in a "'public area' of the polling place where they will not interfere with the voting process." *Managing Your Precinct on Election Day*, Mich. Dep't of State, Bureau of Elections (Jan. 2016) ("SOS Guide"), at 19, *available at* https://www.michigan.gov/documents/sos/Managing_Your_Precinct _on_Election_Day_391790_7.pdf.  However, that general rule is subject to several important limitations:

> a.  First, Michigan law restricts the ability to *challenge* another voter's eligibility to vote to a "registered elector" in Michigan who has been officially designated by a political party or qualified interest group and authorized by state election officials.  Mich. Comp. Laws § 168.730.  All challengers must have in their "possession a 'challenger card' issued by the party or organization" represented.  SOS Guide at 15.

32

b. Second, any challenge to a voter's qualifications must be based on a "good reason to believe [the voter] is not a registered elector," Mich. Comp. Laws § 168.733(1)(c), and thus cannot be based upon a voter's appearance, race, gender, or national origin.   "A challenger does not have the right to issue a challenge based on an 'impression' that the voter may not be eligible to vote in the precinct due to the voter's manner of dress, inability to read or write English, perceived race or ethnic background or need for assistance with the voting process. Similarly, a challenger does not have the right to issue a challenge due to any physical or mental disability the voter may have or is perceived to have."  SOS Guide at 17.  Michigan law penalizes "[a] person who challenges a qualified elector for the purpose of annoying or delaying the voter."  *Id.* at 8.

c. Third, Michigan law provides that challengers "shall not threaten or intimidate an elector while the elector is entering the polling place, applying to vote, entering the voting compartment, voting, or leaving the polling place."   Mich. Comp. Laws § 168.733(4).   They also may be expelled by election inspectors for "disorderly conduct."  *Id.* § 168.733(3).

33

"Challengers do not have the authority to approach voters or talk to voters for any reason."  SOS Guide at 16.

d. Fourth, non-challenger members of the public observing elections in Michigan "are subject to the same 'conduct standards' as challengers," SOS Guide at 19, including the prohibition on any threats or intimidation of voters, *id.* at 16.

e. Fifth, with a limited exception for news media, "the use of video cameras, still cameras and recording devices by voters, challengers and poll watchers is prohibited in the polls during the hours the polls are open for voting" in Michigan.  SOS Guide at 4.

65.   "Michigan election law does not specifically regulate exit polling."  SOS Guide at 14.  However, Michigan elections officials "recommend[] that exit pollsters 1) must remain at least **20 feet** away from the entrance of the building in which the polling place is located 2) not enter the building in which the polling place is located and 3) not question any person **entering** the building in which the polling place is located."  *Id.*  They also have stated that "[i]t is important to note that exit polling is the questioning of voters **after they have left the polls**."  *Id.*

\*       \*       \*

66. It is unfortunate that this Complaint must be filed. What would be more unfortunate still is if the harms against which Congress acted in the 1870s and the 1960s were allowed to return to undermine the democratic process. This Court should act quickly and firmly to ensure that the citizens of Michigan are able to vote free from intimidation in the 2016 election.

## COUNT ONE: KU KLUX KLAN ACT

67. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

68. Defendants the Trump Campaign, Stone, Stop the Steal Inc., and the MRP have called on supporters to descend on polling places in "certain areas"— generally, the urban communities of color where they and their allies have stoked fabricated threats of massive voter fraud—in order to intimidate voters at the polls. Trump's calls to stake out polling places in those communities and to suspiciously, aggressively "watch" these minority voters—"You know what I mean," he has clarified for his co-conspirators—have resulted in plans to engage in "racial profiling" and threaten lawful voters with the prospect of monitoring, questioning after voting under the guise of phony "exit polling," baseless legal action, and even possible physical harm, including unlawful detention because they have come to the polling place to cast a ballot.

69.     The Trump Campaign, Stone, and Stop the Steal Inc. have engaged in online organizing and mobilization efforts to support their plan.

70.     The RNC and Defendant MRP are providing financial, personnel, and other organizational support to the voter intimidation efforts launched by the Trump Campaign, Stone, and Stop the Steal Inc. in violation of the Ku Klux Klan Act.

71.     Absent declaratory and injunctive relief, voters will be subjected to intimidation, threats, and perhaps even force at the hands of vigilante "poll watchers" and "ballot integrity" volunteers on Election Day, and many may suffer unwarranted delays or denials of their right to cast a ballot in the approaching elections.

72.     Plaintiffs are entitled to a declaration that the MRP, the Trump Campaign, Stone, Stop the Steal Inc., and their co-conspirators have violated the Ku Klux Klan Act through their conspiracy to intimidate voters, and an injunction enjoining Defendants and others from any further activity to advance their conspiracy.

## COUNT TWO: VOTING RIGHTS ACT

73.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

74.    Following Trump's urging, Defendants have called for—and their supporters have promised—polling-place activity that is objectively likely to instill fear in voters.  Such intimidation includes racial targeting, invasions of physical space, aggressive questioning and other forms of menacing, suggestions of possible criminal prosecution, and threats of physical violence or harm.

75.    The RNC and Defendant MRP have provided financial, personnel, and organizational support to the efforts of the Trump Campaign, Stone, and Stop the Steal Inc. to organize people to engage in intimidation efforts in Michigan.

76.    This planned course of intimidation constitutes a violation of Section 11(b) of the Voting Rights Act, which prohibits all actual or attempted "intimidation," "threats," or "coercion" against a person, either "for voting or attempting to vote."

77.    Absent declaratory and injunctive relief, voters will be subjected to intimidation, threats, and perhaps even force at the hands of vigilante "poll watchers" and "ballot integrity" volunteers on Election Day, and many may suffer unwarranted delays or denials of their right to cast a ballot in the approaching election.

78.    Plaintiffs are entitled to a declaration that the MRP, the Trump Campaign, Stone, Stop the Steal Inc., and their co-conspirators have violated Section 11(b) of the Voting Rights Act.

37

## COUNT THREE:  INJUNCTIVE RELIEF

79.    Based on Defendants' above-described violations of law, Plaintiff is entitled to an injunction enjoining the Defendants, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from any of their contemplated voter-intimidation activity. This activity includes but is not limited to:

   a. Funding, encouraging, or otherwise supporting, including by training or organizing, individuals who are not officially appointed challengers under Michigan law to be present at or around polling places or voter lines to challenge, investigate, interfere with, or otherwise act to prevent any person from voting, including but not limited to confronting potential voters and verifying their eligibility at the polls, distributing literature stating to individuals that voter fraud is a crime, or describing the penalties under any state or federal statute for impermissibly casting a ballot;

   b. Monitoring polling places, or permitting, encouraging, or assisting individuals to monitor polling places, including but not limited to confronting potential voters and verifying their eligibility at the polls, distributing literature stating to

individuals that voter fraud is a crime, or describing the penalties under any state or federal statute for impermissibly casting a ballot, if the proposed monitor does not comply with the statutory requirements for such monitoring activities under Michigan law;

c. Gathering or loitering outside of any polling place for the purpose or with the effect of interfering with or intimidating voters;

d. Questioning, interrogating, or verbally harassing prospective voters or voters, or training, organizing, or directing others to do the same, for the purpose or with the effect of intimidating prospective voters or voters;

e. Following, taking photos of, or otherwise recording prospective voters or voters, those assisting prospective voters or voters, or their vehicles, or training, organizing, or directing others to do the same;

f. Questioning, or training, organizing, or deputizing any persons to question, prospective voters or voters at Michigan polling locations under the guise of purported "exit polling" or "citizen

journalist" operations organized and encouraged by Defendants Stone and Stop the Steal.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court:

a)      Declare that the harassment or intimidation of voters at or outside of Michigan polling locations based on unsubstantiated beliefs in supposed voter fraud—including through tactics such as the aggressive questioning of those waiting to vote, threats or suggestions of legal or criminal action, or any other form of menacing or intimation of violence—is contrary to law.

b)      Declare that Defendants' "exit polling" and "citizen journalist" initiatives are contrary to law.

c)      Restrain and enjoin any conduct alleged above.

d)      Restrain and enjoin the MRP, the Trump Campaign, Stone, Stop the Steal Inc., and their affiliates and collaborators from organizing efforts to engage in voter intimidation.

e)      Publicize the declaratory judgment and/or injunctive Order to all law enforcement and elections officials.

f)      Award Plaintiff the expenses, including attorneys' fees and costs, incurred in prosecuting this action.

g)      Grant such other relief as this Court may deem proper.

Respectfully submitted,

*/s/ Mary Ellen Gurewitz*
Mary Ellen Gurewitz (P25724)
SACHS WALDMAN, P.C.
2211 E. Jefferson Ave., Ste. 200
Detroit, MI 48207
Tel: 313-496-9441
megurewitz@sachswaldman.com

*/s/Andrew Nickelhoff*
Andrew Nickelhoff (P37990)
SACHS WALDMAN, P.C.
2211 E. Jefferson Ave., Ste. 200
Detroit, MI 48207
Tel: 313-496-9429
anickelhoff@sachswaldman.com

*Counsels for Plaintiff*

OF COUNSEL:

Marc E. Elias
PERKINS COIE LLP
700 13th Street, Suite 600
Washington, DC 20005
Tel: (202) 434-1609/Fax: (202) 654-9126
melias@perkinscoie.com

Michael J. Gottlieb
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, N.W.
Washington, DC  20015
Tel: (202) 237-2727/Fax: (202) 237-6131
mgottlieb@bsfllp.com

Dawn L. Smalls
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Tel: (202) 754-4216/Fax: (212) 446-2350
dsmalls@bsfllp.com

Date: November 4, 2016

41