## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Michigan State Democratic Party, <br><br> Plaintiff, <br><br> v. <br><br> Michigan Republican Party, Donald J. Trump for President, Inc., Roger J. Stone, Jr., and Stop the Steal, Inc., <br><br> Defendants. | Case No. 16-13924 <br><br> Hon. Mark A. Goldsmith <br><br> **DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S MOTION TO DISMISS UNDER RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE** |

Donald J. Trump for President, Inc. (the "Campaign") respectfully requests that this Court dismiss this case under Rule 12(b)(6).  Concurrent with this Motion, the Campaign has filed a supporting brief, as required by Local Rule 7.1.

In compliance with E.D. Mich. Local Rule 7.1(a), the Campaign's counsel called Plaintiff's counsel on November 7, 2016, to (i) explain the nature of this Motion and its legal basis, and (ii) request concurrence in the relief sought.  Plaintiff's counsel refused to concur in the relief sought.

LOCAL RULE CERTIFICATION:  I, Jeffrey J. Jones, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for

proportional fonts). I also certify that it is the appropriate length.   Local Rule

7.1(d)(3).



Dated: November 7, 2016                    Respectfully submitted,

                                   By:   */s/* Jeffrey J. Jones
                                         Jeffrey J. Jones
                                         JONES DAY
                                         150 W. Jefferson St., Suite 2100
                                         Detroit, MI 48226
                                         jjjones@jonesday.com
                                         T:  313.733.3939
                                         F:  313.230.7997

                                         *Counsel for Defendant*
                                         *Donald J. Trump for President, Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Michigan State Democratic Party,<br><br>   Plaintiff,<br><br> v.<br><br>Michigan Republican Party, Donald J. Trump for President, Inc., Roger J. Stone, Jr., and Stop the Steal, Inc.,<br><br>   Defendants. | Case No. 16-13924<br><br>**BRIEF IN SUPPORT OF DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S MOTION TO DISMISS UNDER RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE** |

Plaintiff Michigan Democratic Party filed this lawsuit on November 4, 2016—just four days before the 2016 election.  In its Complaint, Plaintiff asks for preliminary relief.  But the election is tomorrow, and Plaintiff still has inexplicably not moved for that relief.  Plaintiff's failure to prosecute confirms what the flimsy allegations in the Complaint suggest: this suit is a political stunt, not an attempt to redress a genuine grievance.  The issue in this brief is whether the Court should dismiss this case.  Donald J. Trump for President, Inc. (the "Campaign") respect-fully suggests that it should.

## LOCAL RULE 7.1(D)(2) STATEMENT OF AUTHORITY

Order, *Ohio Democratic Party v. Donald J. Trump for President, Inc.*, No. 16-4268 (6th Cir. Nov. 5, 2016) (Ex. A).

## BACKGROUND

Citing opaque remarks in public speeches by political candidates and Twitter remarks from unaffiliated individuals, Plaintiff asserts that the Campaign and the Michigan Republican Party are engaged in a conspiracy to intimidate voters, thus violating Section 11(b) of the Voting Rights Act, and 42 U.S.C. § 1985(3). These allegations are hardly novel: Plaintiff's complaint is one of many cookie-cutter suits filed in courts across the country. Each is legally baseless, and represents a transparent attempt to garner attention and waste the Campaign's resources in the days leading up to the election.

These frivolous suits have uniformly failed. For example, in the materially identical Ohio version of this case, the Sixth Circuit held that the Ohio Democratic Party had not "demonstrate[d] . . . a likelihood of success on the merits," and was therefore not entitled to any temporary or preliminary injunctive relief. Order, *Ohio Democratic Party v. Donald J. Trump for President, Inc.*, No. 16-4268 (6th Cir. Nov. 5, 2016) (Ex. A). Just today, the Supreme Court denied the Ohio plaintiff's application to vacate the Sixth Circuit's decision. *See Ohio Democratic Party v. Donald J. Trump for President*, No. 16A461 (U.S. Nov. 7, 2016) (Ex. B).

In the Eastern District of Pennsylvania, Judge Diamond denied the Pennsylvania Democratic Party's motion for a temporary restraining order in a materially identical case, sharply chastising the Plaintiff for its baseless allegations. As Judge Diamond aptly put it:

> Our Republic is premised on the right of its citizens to select their leaders. Had Plaintiff made any credible showing—much less the required clear showing—that Defendants intended to jeopardize that right, I would not hesitate to take immediate action. Plaintiff has made no such showing, however. Its belated, inflammatory allegations appear intended to generate only heat, not light. Presumably, that is why identical efforts have so far been rejected by the Arizona and Nevada District Courts and the Sixth Circuit. I will also deny Plaintiff's eleventh-hour request for emergency injunctive relief.

Memorandum, *Pennsylvania Democratic Party v. Republican Party of Pennsylvania, et al.*, No. 16-cv-5664, at 16 (E.D. Pa., Nov. 7, 2016) (Ex. C).

The other cookie-cutter cases in this sneak attack have fared no better. A district court in Nevada, after holding three separate evidentiary hearings on plaintiff's TRO request, denied relief in full. *See* Tr. of Mot. Hearing (Ruling), *Nevada State Democratic Party v. Nevada Republican Party*, No. 2:16-cv-02514 (Nov. 4, 2016) (Ex. D). Likewise, in Arizona, Judge Tuchi denied plaintiff's TRO request in a 25-page written order after an evidentiary hearing, concluding that plaintiff failed to show a likelihood of success on the same two claims raised in this action. *See* Order, *Arizona Democratic Party v. Arizona Republican Party*, No. 16-cv-03752 (Nov. 4, 2016) (Ex. E). Judge Tuchi's extensive Order explained that plaintiff "has not demonstrated it is likely to succeed in showing the statements and ac-

tions of Defendants to-date constitute intimidation, threat, coercion or force against voters for voting or attempting to vote in violation of" the relevant statutes. *Id*. at 24.

That every single one of these cases to reach decision has failed is no surprise when one considers the pleadings here. Plaintiff's complaint accuses the Campaign, the Michigan Republican Party, and others of conspiring to "threaten, intimidate, and thereby prevent" voters from voting in the 2016 election. Complt. ¶ 1. But the factual allegations that are supposed to demonstrate the existence of a "conspiracy" are remarkably thin. Plaintiff chiefly relies on a handful of stray comments cherry picked from media reports covering hundreds of hours of campaign speeches by the Republican Presidential and Vice-Presidential candidates. Setting aside the obvious evidentiary issues with relying on press accounts, nothing in those speeches can justify the extraordinary restriction of quintessential political conduct that Plaintiff's Complaint seeks. The speech at issue includes general references to campaign volunteers "watching" polling places, *id.* ¶¶21–24, invitations to supporters to participate in the election to ensure it is not "stolen," *id.* ¶27, and questions regarding the possibility of election fraud, *id.*, a notion that enters the political vernacular (and process, on occasion) *every* election season. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J.) (explaining that states have a valid interest "in deterring and detecting voter fraud"). On its face,

none of this amounts to express direction that Michiganders engage in forms of "voter suppression," or "vigilantism."  Complt. ¶¶39–40.

Some of Plaintiff's allegations are simply misleading.  In the very first paragraph of the Complaint, for example Plaintiff cites an anonymous quote, supposedly made by an "unnamed official" to Bloomberg News, that the Campaign has "three major voter suppression operations under way."  Complt. ¶1.  But Plaintiff eliminates all context.  And the context reveals that this source (if she exists) was not referring to attempts to intimidate anyone from voting.  Rather, she was referring to strategies to distribute negative information about Hillary Clinton to "three groups [Hillary] Clinton needs to win overwhelmingly: idealistic white liberals, young women, and African Americans."  The goal was not to intimidate anyone, but rather to "turn off" those voters and "undermine [Clinton's] appeal," making those constituencies less likely to "show[] up at the polls—particularly in Florida."  The full passage is as follows:

> Trump's campaign has devised another strategy … . Instead of expanding the electorate, [the Campaign] is trying to shrink it. "We have three major voter suppression operations under way," says a senior official. They're aimed at three groups Clinton needs to win overwhelmingly: idealistic white liberals, young women, and African Americans. Trump's invocation at the debate of Clinton's WikiLeaks emails and support for the TransPacific Partnership was designed to turn off Sanders supporters. The parade of women who say they were sexually assaulted by Bill Clinton and harassed or threatened by Hillary is meant to undermine her appeal to young women.

> And her 1996 suggestion that some African American males are "super predators" is the basis of a below the radar effort to discourage infrequent black voters from showing up at the polls—particularly in Florida.

*See* Ex. 17 of Plaintiff's Notice of Motion and Motion for a Temporary Restraining Order and/or Preliminary Injunction, *Ohio Democratic Party v. Ohio Republican Party, et al.*, No. 16-cv-02645 (N.D. Oh. 2016). The quote at issue, in other words, addresses substantive advocacy—and it makes no reference to Election Day, poll watchers, or anything of the sort. *See* Memorandum, *Pennsylvania Democratic Party* at 11 (Ex. C).

Plaintiff also cites statements urging supporters to serve as "poll watchers," Complt. ¶ 30, also known as poll observers; a long-standing practice used by both parties and sanctioned by Michigan law. *See* Mich. Dep't of State, Bureau of Elections *Managing Your Precinct on Election Day* (Jan. 2016) ("SOS Guide"), at 19, https://goo.gl/cztqE7. Plaintiff suggests a nefarious motive in the Michigan Republican Party and Campaign seeking volunteers in urban areas like Detroit and Chicago, *see* Complt. ¶¶ 26, 27, 46, yet it fails to acknowledge the obvious; these are the largest cities with the largest concentration of voters in states critical to the outcome of the election. And Plaintiff strains to impute nebulous unlawful connotations to the prospect that many voters and observers may wear red-colored clothing to the polling place. *Id.* ¶ 34. (Plaintiff conveniently omits the fact that supporters of its nominee for President are likewise planning to wear particular cloth-

ing on election day. *See, e.g.*, Natalie Andrews, *Hillary Clinton Supporters Plan to Sport Pantsuits at the Polls*, The Wall Street Journal (Nov. 3, 2016).)

Compare these thin allegations to the record assembled in *Daschle v. Thune*, the lone case Plaintiff cites to justify granting a TRO. *See* Cmplt. ¶20 (citing Temporary Restraining Order, *Daschle v. Thune*, No. 04-cv-4177, Dkt. No. 6 (D.S.D. Nov 2. 2004)). There, the TRO was issued only after the plaintiff presented express evidence—including "[o]ral testimony" and "photographs," *id.* at 1—revealing that individuals were "follow[ing] Native Americans from the polling places," "copy[ing] [their] license plates," and recording "the license plates of Native Americans driving away for the polling places." *Id.* at 2. The allegations in Plaintiff's complaint suggest that nothing similar—or even in the same ballpark—could be shown here.

Perhaps best illustrating the weakness in Plaintiff's case is its reliance on stray remarks from Twitter and other places. *See* Cmplt. ¶¶ 55, 59. This patchwork of comments came from non-parties who are not controlled by, and have no discernible connection to, the Campaign. (The Complaint also includes allegations against other defendants. Those parties are not associated with the Campaign or the Michigan Republican Party. Nonetheless, Plaintiff's claims against those defendants fail for many of the reasons articulated here.)

## ARGUMENT

**I.   Plaintiff's complaint should be dismissed for failure to state a claim.**

Plaintiff accuses the Campaign of violating Section 11(b) of the Voting Rights Act, and 42 U.S.C. § 1985(3).  The Campaign moves to dismiss both, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim. "To survive a 12(b)(6) motion, the complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Long v. Insight Commc'ns of Cent. Ohio, LLC*, 804 F.3d 791, 794 (6th Cir. 2015) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Neither of Plaintiff's claims satisfies this standard.

**A.   Plaintiff Failed to State a Claim Under the Voting Rights Act.**

To prevail under Section 11(b) of the Voting Rights Act, a plaintiff must prove "(1) that there was an intimidation, threat or coercion, or an attempt to intimidate, threaten or coerce and (2) that the intimidation or attempt was for the purpose of interfering with the right to vote." *Am. Fed'n of State, Cty. & Mun. Employees, Council 25 v. Land*, 583 F. Supp. 2d 840, 846 (E.D. Mich. 2008); *see also Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir. 1985); *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016).  Claims under this provision are exceedingly

difficult to establish.  As one court noted in 2009, research had turned up "no case in which plaintiffs have prevailed under this section."  *United States v. Brown*, 494 F. Supp. 2d 440, 477 n.56 (S.D. Miss. 2007), *aff'd*, 561 F.3d 420 (5th Cir. 2009); *see also, e.g.*, *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498–99 (E.D. Va. 2016) (finding no likelihood of success on the merits).

Unsurprisingly, Plaintiff failed to clear even the first hurdle.  As explained above, its various allegations of "intimidation" are nothing more than legitimate exercises of free speech and other protected legal activity.  Wearing shirts that happen to be red—a ubiquitous color, particularly in Detroit during hockey season—is no more the kind of activity that inspired the statute than wearing pantsuits. Cmplt. ¶ 9.  Moreover, the Campaign has *no intention whatsoever of conducting exit polls*; Plaintiffs do not allege otherwise.  And besides, exit polling is a regular, harmless feature of the election-day process, and an entirely proper exercise of First Amendment rights.  Further, poll watching is a legal, statutorily sanctioned activity in Michigan.  These benign activities bear no resemblance to the conduct demonstrated in *Thune*—a case involving a concerted effort to follow a discrete class of voters (Native Americans) to record their license-plate numbers.  *See Thune*, Dkt. No. 6.

The Section 11(b) claim fails for an additional reason: Plaintiff has not alleged any facts plausibly suggesting that the Campaign "intend[s] to intimidate"

individuals from voting.  *Olagues*, 770 F.2d at 804.  All Plaintiff can point to are vague comments warning that the election could be "stolen" if supporters do not monitor for fraud.  The expression of concerns about voter fraud is plainly not enough to constitute "intimidation."

### B.   Plaintiff Has Not Pled a Valid Claim Under 42 U.S.C. § 1985(3).

Plaintiff's second claim fares no better.  To succeed under the portions of that section on which Plaintiff relies, there are two options.  The first requires proof that "two or more persons [have] conspir[ed] to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election . . . ."  42 U.S.C.A. § 1985(3).  As explained above, there are no allegations of a conspiracy or any "force, intimidation, or threat," and so that option is unavailable.  Moreover, as with claims under Section 11(b), this claim is difficult to prove.

The second option requires proof "that the defendants (1) conspired together, (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws, (3) and committed an act in furtherance of the conspiracy, (4) which caused injury to person or property, or a deprivation of any right or privilege of a citizen of the United States, and (5) and that the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus."  *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999) (citing *Griffin v. Brecken-*

*ridge*, 403 U.S. 88, 102–03 (1971)).  But Plaintiff has not, and could not even conceivably, argue that the vague policy and get-out-the-vote statements to which its complaint refers constitutes the denial of "the equal protection of the laws."  *Bass*, 167 F.3d at 1050.

*      *      *

This case is a political stunt, completely lacking in merit.  This Court should put an end to it.

## II.  Plaintiff would not be entitled to preliminary injunctive relief, or a temporary restraining order, *even if* it had not failed to state a claim.

Assuming for the sake of argument that Plaintiff can survive a motion to dismiss, its request for injunctive relief should nevertheless be denied—just as the Sixth Circuit unanimously denied a parallel request for injunctive relief in Ohio.  *See* Order, *Ohio Republican Party* (Ex. A).

Preliminary injunctive relief "is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  In assessing whether a movant is entitled to such relief, courts apply the same standard for both preliminary injunctions and temporary restraining orders.  *Summit Cty. Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547, 550 (6th Cir. 2004).  Courts consider: "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would other-

wise suffer irreparable injury; (3) whether issuance of a [temporary restraining order] would cause substantial harm to others; and (4) whether the public interest would be served by issuance" of a temporary restraining order. *Id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2009)).

While this test is always difficult to satisfy, it is even more difficult to do so where, as here, the requested injunction would interfere with the electoral process on the eve of an election. That is because, in addition to the factors set forth above, courts must also weigh "considerations specific to election cases." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). These include the fact that "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls"—which is a risk that only increases "[a]s an election draws closer." *Id.* In this case, Plaintiff's motion fails at every step.

## A.   Plaintiff Cannot Establish a Likelihood of Success.

For the same reasons that Plaintiff failed to state a claim for relief—as detailed above—it has failed to demonstrate a likelihood of success.

## B.   Plaintiff Cannot Show That Anyone Will Be Irreparably Harmed By The Court's Refusal to Award A Temporary Restraining Order.

As addressed above, Plaintiff has not alleged a single fact suggesting that the Campaign will do anything to pressure anyone out of voting for her preferred candidate, or that violates anyone's rights. In other words, Plaintiff has given no reason to believe that anyone will be irreparably harmed by the denial of a stay.

**C.  Entering A TRO Would Substantially Harm Third Parties, Thereby Undermining The Public Interest.**

Plaintiff's request for emergency relief should also be denied because the "issuance of [injunctive relief] would cause substantial harm to others," and would be contrary to the public interest. *Summit Cty.*, 388 F.3d at 550.

**1.**  Because democracy depends upon the free exchange of ideas, the First Amendment forbids laws "abridging the freedom of speech."  U.S. Const., Am. 1. Political speech "is at the core of what the First Amendment is designed to protect."  *Morse v. Frederick*, 551 U.S. 393, 403 (2007).  The Supreme Court has thus long interpreted that Amendment as "afford[ing] the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14–15 (1976) (per curiam)).

The Complaint relies on numerous statements that are unambiguously protected political speech.  *See, e.g.*, Complt. ¶ 22 ("The only way we can lose, in my opinion—and I really mean this, Pennsylvania—is if cheating goes on."); *id*. ¶ 23 ("You've got to get everybody to go out and watch, and go out and vote.").  As Plaintiff is well aware, candidates are perfectly within their rights to encourage their supporters to serve as poll watchers.  *See, e.g.*, Join Victory Counsel, HILLARY FOR AMERICA, *available at* https://perma.cc/MV9U-35QP ("Volunteer to protect

the vote as a poll observer this election cycle."). And supporters of opposing candidates are perfectly within their rights to debate whether an election is at risk of being "rigged" because of voter fraud. However upsetting or deplorable Plaintiff may find these views, it cannot restrict them. *See Snyder v. Phelps*, 562 U.S. 443, 461 (2011). It is hard to imagine a court order more inimical to the public interest than one aimed at chilling a candidate's or citizen's political speech.

In many respects, the proposed TRO seeks, in essence, an order directing Defendants and others to "obey the law." But "[i]njunctions that broadly order the enjoined party simply to obey the law and not violate the statute are generally impermissible." *N.L.R.B. v. U.S. Postal Serv.*, 486 F.3d 683, 691 (10th Cir. 2007); *see also E.E.O.C. v. Wooster Brush Co. Employees Releif Ass'n*, 727 F.2d 566, 576 (6th Cir. 1984) (explaining that "'obey the law' injunctions cannot be sustained."). That is so because such injunctions "often lack the specificity required by Rule 65(d)." *S.E.C. v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012); *see* Fed. R. Civ. P. 65(d) (requiring that every temporary restraining order and injunction "state its terms specifically"). Rule 65 "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Temporary restraining orders should thus "be phrased in terms of objective actions, not legal conclusions." *Goble*, 682 F.3d at 950 (in-

ternal quotation marks omitted).

This is particularly critical in the speech context. Injunctions "carry greater risks of censorship and discriminatory application than do general ordinances." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764 (1994). Courts thus interpret the First Amendment to permit speech-restricting injunctive relief "only if there is a showing that the defendant has violated, or imminently will violate, some provision of statutory or common law." *Id.* at 765 n.3. As explained above, the supposed legal violations are based on pure speculation. Further, even content-neutral injunctions must "burden no more speech than necessary to serve a significant government interest." *Id.* at 765. Yet Plaintiff has made no effort to show that the exceptionally broad relief it seeks "burdens no more speech than necessary" to serve a significant government interest. In addition, the proposed injunctions here *are* content-based, since Plaintiff is seeking to "dra[w] distinctions based on the message a speaker conveys," *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015); Plaintiff asks the Court to declare citizens free to speak "around polling places," but only if they do not convey certain messages. Because the injunction is content-based, it is subject to strict scrutiny—a standard Plaintiff plainly cannot satisfy given that it cannot even satisfy the lesser standard that applies to content-neutral injunctions.

The "First Amendment embodies our choice as a Nation that, when it comes

15

to [political] speech, the guiding principle is freedom—the unfettered interchange of ideas." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 750 (2011) (internal quotation marks omitted).  Despite this command, Plaintiff has regrettably made it necessary to say that which should go without saying:  court orders that punish and restrict political speech are contrary to the public interest, impose substantial costs on the electorate, and are appropriate (if ever) only in the most dramatic circumstances.

Just a peek at some of the relief Plaintiff requests demonstrates just how offensive its preferred order would be.  *First*, Plaintiff asks the Court for an injunction against Defendants "and those persons who are in active concert or participation with them" from "supporting" individuals "to be present at or around polling places or voter lines to challenge" any potential voters.  Complt. ¶79.  Such an order might be interpreted to include all those who support Donald Trump.  Thus, those who support Donald Trump—but not those who support Hillary Clinton, Gary Johnson, or someone else—will violate the order if they "*support*" anyone asking anyone else outside the polling place who reasonably appears too young to vote whether he is in fact 18-years-old.  So if a Donald Trump supporter attempting to encourage voter turnout on a sidewalk, hundreds of feet from the polling place, asks those with whom he speaks whether they are eligible to vote—so as to not waste his time on non-voters—he will have violated the terms of the injunction.

Unconstitutional. *See E. Connecticut Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1051 (2d Cir. 1983) ("The right to communicate freely with one's fellow citizens and with the government on issues of public importance is a cornerstone of our American polity.").

*Second*, Plaintiff requests that the Campaign and its supporters be barred from "distributing literature (and/or stating to) individuals that voter fraud is a crime." Cmplt. ¶79. A more obvious First Amendment violation is difficult to imagine. "[O]ne-on-one communication is the most effective, fundamental, and perhaps economical avenue of political discourse," and "handing out leaflets in the advocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression." *McCullen v. Coakley*, 134 S. Ct. 2518, 2536 (2014) (internal quotation marks omitted). Thus, citizens—whether working on a campaign or not—are free to speak with others and distribute literature. And they are free to express legal views in the course of these communications. *See Velo v. Martinez*, 820 F.3d 1113, 1118 (10th Cir. 2016). To issue a content- and viewpoint-based injunction against one political group, and to do so in vague terms is exactly what the First Amendment exists to prevent; "the First Amendment is plainly offended" when the government's "suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people." *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 785–86, (1978).

*Third*, Plaintiff says the Defendants should be prohibited from "[f]ollowing, taking photos of, or otherwise recording voters or prospective voters, or their vehicles." Cmplt. ¶79(e). The Campaign and the Michigan Republican Party condemn voter intimidation. These proposed terms are nonetheless troubling, because they are much too vague, and much too broad. For example, those terms would bar a voter who believes she is being harassed by precinct officials in a polling-place parking lot, from using her phone to record the misconduct. Unconstitutional. *See Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014) ("[T]he Constitution protects the right of individuals to videotape police officers performing their duties in public.")

Even the phrase "voter intimidation" is too vague. Suppose the Campaign's supporters, hundreds of feet from the polling place, chant "make America great again!" in the presence of voters. Is that "intimidation"? Hard as it is to believe, some people think so. *See, e.g.*, Jim Galloway, *Chalk one up for Donald Trump at Emory University*, ATLANTA JOURNAL CONSTITUTION (Mar. 22, 2016), https://perma.cc/6VQ5-NB59 (reporting that, after individuals wrote pro-Trump slogans such as "Trump 2016" in chalk on Emory University's campus, the President of Emory University circulated a letter explaining that some students believed "these messages were meant to intimidate."). Can Campaign employees or supporters engage in this obviously protected speech without having to fear a contempt hearing? It is unclear, because the terms of the proposed injunction are

much too ambiguous.  And that is a problem, because "[i]t is settled that" restraints on speech "so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void, on its face." *Winters v. N.Y.*, 333 U.S. 507, 509 (1948).  First Amendment rights, therefore, cannot "be imperiled by threatening" punishment "for so vague an offense as follow[ing] and harass[ing]." *McCullen*, 134 S. Ct. at 2543 (Scalia, J., concurring in the judgment) (internal quotation marks omitted).  Yet Plaintiff believes the government really should punish so vague an offense.  Unconstitutional.

There is no way to enter the proposed injunction without imperiling the rights of Michiganders.  And that tilts the balance of equities strongly in the Campaign and the Michigan Republican Party's favor.  That is particularly so here, where there is *no* evidence that the Campaign or the Michigan Republican Party has done or will do anything improper; Plaintiff is effectively asking this Court to limit the rights of many for the purpose of solving a problem that does not exist.

**2.**  The vague injunction Plaintiff seeks is also infirm because it is likely to dissuade citizens from exercising their rights, and threatens to interfere with the State's orderly management of the election.

To the extent Plaintiff's requested injunction extends beyond merely ordering Defendants to comply with Michigan law, the injunction contemplates relief

that would infringe rights the parties and indeed all Michiganders enjoy.  Voting procedures are highly regulated; Michigan has codified an extensive framework of rules governing voting.  Yet Plaintiff ignores nearly all of them.

To start, many of Plaintiff's allegations focus on statements encouraging supporters to serve as "poll watchers."  Complt. ¶ 23.  But Michigan law expressly permits political parties to designate up to two "challengers" to serve in a precinct at any one time. Mich. Comp. Laws § 168.730.

Balancing the need for honest and open elections with the desire for a safe, orderly process, Michigan law prescribes the actions a challenger is entitled to take and not take.  Mich. Comp. Laws § 168.733.  For example, challenges are allowed to inspect the poll books, challenge the voting rights of anyone the challenger has good reason to believe is not a registered voter, and challenge an election procedure that is not being performed properly.  *Id.*  Challengers may not, however, engage in "disorderly conduct" or "threaten or intimidate an elector."  *Id.* In addition, "any interested person" in Michigan is entitled to observe elections in a "'public area' of the polling place where they will not interfere with the voting process." SOS Guide 19.  There is simply nothing impermissible about the Campaign or the Michigan Republican Party encouraging or facilitating Michigan supporters' service in permitted political activity.

Measured against this statutory backdrop, Plaintiff's claim that Defendants

have "directed [their] supporters to engage in activity forbidden by Michigan state election law" by calling for supporters to serve as poll watchers, Complt. ¶ 61, is an invitation to punish lawful, political conduct.   The State has enshrined poll watching as a means for ensuring trust in our election outcomes.   Plaintiff provides no evidence that Defendants have done anything more than seeking to exercise this statutory right (or engage in other protected activity outside polling places).   *See id.* ¶ 45 (quoting Governor Pence as stating, "I would encourage everyone within the sound of my voice, get involved, participate, be a poll worker on election day … be a part of that process, and uphold the integrity of one person one vote in America.").

Equally troubling is Plaintiff's suggestion that Defendants seek to depress voter participation by invoking concerns about potential voter fraud.   *See* Complt. ¶ 68.   Regardless of whether Plaintiff believes voter fraud is real or imaginary, Michigan itself has enacted rules designed to maintain the integrity of the vote. For example, the State requires voters to either present photo identification before voting or sign an affidavit.   SOS Guide 19.   In addition, the Secretary of State must maintain a voter file, ensuring those in the file are eligible to vote.   Mich. Comp. Laws Ann. § 168.509r.   Plaintiff repeatedly decries purported efforts to ensure that only citizens cast votes, *e.g.*, Complt. ¶ 29, but it is, of course, *illegal* for a non-citizen to vote.   *See* 18 U.S.C. § 611 ("It shall be unlawful for any alien to vote in

any election.").

Finally, Plaintiff seeks to infringe on Michiganders' First Amendment right to conduct exit polling. *See id.* Prayer for Relief (b) (requesting injunction prohibiting "'exit polling' or 'citizen journalist' initiatives"). First and foremost, the Campaign has no intention of conducting any exit polls—this issue is thus irrelevant as to the Campaign. But even if it did want to conduct exit polls, respectfully asking voters how they voted is a well-worn tradition in American politics that has become a staple of every election and that is, more importantly, protected by the First Amendment. Hence, the Ninth Circuit invalidated on First Amendment grounds a statute that prohibited exit polling within 300 feet of a polling place as an impermissible content-based regulation of speech. *See Daily Herald Co. v. Munro*, 838 F.2d 380 (9th Cir. 1988). And a federal district court within the Sixth Circuit previously enjoined any effort to prohibit exit polling even within the 100 foot "buffer" zone at polling places. *See ABC v. Blackwell*, 479 F. Supp. 2d 719, 738 (S.D. Ohio 2006) (holding exit polling "is a form of political speech" and "does not implicate the State's interests in preventing voter intimidation and fraud").

Plaintiff cites no countervailing authority that would support a general ban on exit polling or other journalistic activities, particularly where such restrictions are placed on only one political party or campaign. That is because such conduct

is protected by the First Amendment.

**3.**   One more reason why injunctive relief is contrary to the public interest bears mentioning: injunctive relief entered this close to the election is likely to cause tremendous confusion.  "When an election is 'imminen[t]' and when there is 'inadequate time to resolve [ ] factual disputes' and legal disputes, courts will generally decline to grant an injunction to alter a State's established election procedures." *Crookston v. Johnson*, — F.3d —, No. 16-2490, 2016 WL 6311623, at *2 (6th Cir. Oct. 28, 2016) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006) (per curiam)).  So too should they decline to grant an injunction that creates confusion regarding whether and to what degree one campaign may comply with those "established election procedures." *Id*.  After all, "[c]ourt orders affecting elections … can themselves result in voter confusion and consequent incentive to remain away from the polls," *Purcell*, 549 U.S. at 4–5, and that is true whether the party seeking relief is challenging an election law, or challenging someone's adherence to that law.

The presumption against last-minute orders of the sort Plaintiff proposes in its Complaint—though, oddly, not in a request for a TRO—is especially strong "when a plaintiff has unreasonably delayed bringing his claim, as [Plaintiff] most assuredly has." *Id*.  One of equity's foundational maxims is: "Equity aids the vigilant, not those who slumber on their rights."  Pomeroy, 1 A TREATISE ON EQUI-

TY JURISPRUDENCE § 418, at 572 (2d ed. 1892).  Plaintiff could have brought its fact- and evidence-free claims long ago.  In the words of the Eastern District of Pennsylvania: "There was no need for this judicial fire drill and Plaintiff[] offer[s] no reasonable explanation or justification for the harried process [it] created." Memorandum, *Pennsylvania Democratic Party* at 7 (Ex. C) (internal quotation marks omitted).  After all, nothing in the Complaint suggests Plaintiff learned something "in the last month or even the last week that created" the need for emergency relief.  *Id.*  And Plaintiff's "dilatory conduct," *id.*, is yet another reason to deny relief.

## CONCLUSION

The Campaign respectfully asks this Court to dismiss this frivolous, politically motivated case.

Dated: November 7, 2016

Respectfully submitted,

By:  /s/ Jeffrey J. Jones
Jeffrey J. Jones
JONES DAY
150 W. Jefferson St., Suite 2100
Detroit, MI 48226
jjjones@jonesday.com
T:  313.733.3939
F:  313.230.7997

*Counsel for Defendant Donald J. Trump for President, Inc.*

24

## LOCAL RULE CERTIFICATION

I, Jeffrey J. Jones, certify that this document complies with Local Rule

5.1(a), including: double-spaced (except for quoted materials and footnotes); at

least one-inch margins on the top, sides, and bottom; consecutive page numbering;

and type size of all text and footnotes that is no smaller than 10-1/2 characters per

inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify

that it is the appropriate length. Local Rule 7.1(d)(3).

*/s/* Jeffrey J. Jones
Jeffrey J. Jones
JONES DAY
150 W. Jefferson St., Suite 2100
Detroit, MI 48226
jjjones@jonesday.com
T:  313.733.3939
F:  313.230.7997

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2016, a copy of the foregoing Motion to Dismiss Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, along with the Brief in Support of that motion, were filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

*/s/* Jeffrey J. Jones
Jeffrey J. Jones
