Exhibit A

No.  16-4268

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| OHIO DEMOCRATIC PARTY, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| DONALD J. TRUMP FOR PRESIDENT, INC., | ) | |
| | ) | |
| Defendant-Appellant | ) | |
| | ) | |
| OHIO REPUBLICAN PARTY; ROGER J. | ) | |
| STONE, JR.; STOP THE STEAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

Before:  BATCHELDER, ROGERS, and GRIFFIN, Circuit Judges.

Donald J. Trump for President, Inc. moves for a stay of the district court's temporary restraining order, dated November 4, 2016, enjoining Defendants Donald J. Trump for President, Stop the Steal and Roger J. Stone, Jr., their officers, agents, servants, and employees, and others not parties to this action, including groups associated with the Clinton for Presidency campaign, from engaging in various activities denominated by the district court as voter intimidation activity.

We review for abuse of discretion the district court's order granting a temporary restraining order.  *Ohio Republican Party v. Brunner*, 543 F. 3d. 357, 361 (6th Cir. 2008). We review a motion to stay a temporary restraining order using the same factors that we consider in determining whether to grant a temporary restraining order or a preliminary injunction:

16-4268
- 2 -

> (1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay.

*Id.*

After reviewing the district court's order, the motion for an emergency stay of that order, and the Plaintiff's submission in response to the Petition for Initial En Banc Hearing, we conclude that the Plaintiff did not demonstrate before the district court a likelihood of success on the merits, and that all of the requisite factors weigh in favor of granting the stay.

Accordingly, the motion for an emergency stay is **GRANTED**.

ENTERED BY ORDER OF THE COURT

_____

Deborah S. Hunt, Clerk

Exhibit B

(ORDER LIST:   580 U.S.)

MONDAY, NOVEMBER 7, 2016

ORDER IN PENDING CASE

16A461     OH DEMOCRATIC PARTY V. DONALD J. TRUMP FOR PRESIDENT

The application to vacate stay presented to Justice Kagan and by her referred to the Court is denied.

Statement of Justice Ginsburg respecting the denial of the application to vacate stay.

Mindful that Ohio law proscribes voter intimidation, see, *e.g.*, Ohio Rev. Code Ann. §3501.90(A)(1) (2006) ("Harassment in violation of the election law" includes an "improper practice or attempt tending to obstruct, intimidate, or interfere with an elector in registering or voting at a place of registration or election." (internal quotation marks omitted)), I vote to deny the application.

Exhibit C

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PENNSYLVANIA DEMOCRATIC PARTY,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **Civ. No. 16-5664** |
| | : | |
| **REPUBLICAN PARTY OF** | : | |
| **PENNSYLVANIA; DONALD J. TRUMP** | : | |
| **FOR PRESIDENT, INC.; ROGER J.** | : | |
| **STONE, JR.; and STOP THE STEAL INC.,** | : | |
| **Defendants.** | : | |
| | : | |

**Diamond, J.**                                                              **November 7, 2016**

## M E M O R A N D U M

On October 30, 2016, the Pennsylvania Democratic Party filed suit, asking me to enjoin the Pennsylvania Republican Party, Donald J. Trump for President, Inc., and others from illegally conspiring to suppress minority voting during the November 8 national election. Plaintiff relies upon newspaper and Internet stories, YouTube videos, unattributed reports, and judicial decisions—some decades old; others years, months, or weeks old. Remarkably, Plaintiff did not actually move for injunctive relief until Thursday, November 3, after I ordered it to do so. Plaintiff has not explained this delay, which has crippled Defendants' ability to respond, made relief impracticable, and likely precluded appellate review of this Memorandum and Order before tomorrow's election. Moreover, Plaintiff has produced no evidence of any planned voter intimidation in this District. Finally, insofar as Plaintiff asks me to enjoin conduct that is already prohibited by criminal statutes, such an injunction is impermissible.

After considering all the Parties' submissions and their presentations at today's hearing, I conclude that because Plaintiff has not made the required "clear showing" of entitlement to the relief it seeks, I will deny its Motion.

## I.     Procedural History

Beginning on October 30, 2016, state Democratic parties have filed six identical lawsuits and claims for emergency injunctive relief against different state Republican parties, Donald J. Trump for President, Inc., Roger J. Stone, Jr., and Stop the Steal Inc., alleging imminent voter intimidation in violation of the Voting Rights Act of 1965 and the Civil Rights Act of 1871. (Doc. No. 1; see also No. 16-3752, Doc. No. 1 (D. Ariz. Oct. 31, 2016); No. 16-13924, Doc. No. 1 (E.D. Mich. Nov. 4, 2016); No. 16-2514, Doc. No. 1 (D. Nev. Oct. 30, 2016); No. 16-1288, Doc. No. 1 (M.D.N.C. Nov. 4, 2016); No. 16-2645, Doc. No. 1 (N.D. Ohio Oct. 30, 2016)); 52 U.S.C. § 10307(b); 42 U.S.C. § 1985(3).

On October 30, Plaintiff filed its Complaint here, seeking emergency declaratory and injunctive relief.  (Doc. No. 1 ¶¶ 6, 16, 74, 80.)  Oddly, it filed no motion for emergency relief, nor did it seek expedited discovery.  On Wednesday, November 2, when Plaintiff still had filed no motion, I ordered Plaintiff to do so by November 3.  (Doc. No. 10.)   The next day, Plaintiff filed its Motion for a Temporary Restraining Order and/or Preliminary Injunction, but still did not seek expedited discovery.  (Doc. No. 14.)

I gave Defendants only 24 hours to respond to Plaintiff's Motion.  Accordingly, I received the RPP's Response, and the RPP and Trump Campaign's Joint Response, late on Friday, November 4.  (Doc. Nos. 26, 41.)  Over the weekend, Plaintiff filed a Reply, the Trump Campaign filed a sur-reply, and Plaintiff filed a sur-sur-reply.  (Doc. Nos. 29, 30, 35.)  The RPP has also moved to dismiss for failure to state a claim.  (Doc. No. 31.)  Plaintiff has filed proofs of service as to Mr. Stone and STS.  (Doc. Nos. 15, 16, 33.)  Counsel for Mr. Stone and STS appeared at today's hearing and argued that neither Defendant had been properly served. Counsel also filed a legal memorandum in which Mr. Stone and STS ask me to deny injunctive

relief.  (Doc. No. 42.)

At the hearing I conducted earlier today, Plaintiff called two witnesses who, as I describe below, testified to little more than their dismay at Mr. Trump's statements and a concern that those statements might discourage minority voters.

The relief Plaintiff now seeks is a broad "obey-the-law" injunction.  Plaintiff initially asked me to restrain and enjoin the RPP, the Trump Campaign, Mr. Stone, STS, "and those persons who are in active concert or participation with them" from:

a. Funding, encouraging, organizing or otherwise supporting, individuals who are not officially appointed poll watchers under Pennsylvania law to be present at or around polling places or voter lines to challenge, investigate, interfere, or otherwise act to prevent any person from voting, including but not limited to confronting potential voters and verifying their eligibility at the polls, distributing literature (and/or stating to) individuals that voter fraud is a crime, or describing the penalties under any State or Federal statute for impermissibly casting a ballot.

b. Monitoring polling places, or permitting, encouraging, or assisting individuals to monitor polling places, including but not limited to confronting potential voters and verifying their eligibility at the polls, distributing literature (and/or stating to) individuals that voter fraud is a crime, or describing the penalties under any State or Federal Statute for impermissibly casting a ballot, if the proposed monitor does not meet the statutory requirements for service as a poll watcher;

c. Gathering or loitering within ten (10) feet of a polling place, or permitting, encouraging, or assisting any individuals to gather or loiter within ten (10) feet of a polling place, unless such person is one of the identified poll watchers for each candidate or party who may be present in a polling place at any time;

d. Interrogating, interfering with, or verbally harassing voters or prospective voters, or training, organizing, or directing others to do the same, with the sole exception of questioning that is explicitly authorized by Pennsylvania law;

e. Following, taking photos of, or otherwise recording voters or prospective voters, those assisting voters or prospective voters, or their vehicles, or training, organizing, or directing others to do the same;

3

      f.  Recruiting, training, organizing, or deputizing any persons to question, voters at Pennsylvania polling locations under the guise of the purported "exit polling" or "citizen journalist" operations organized and encouraged by Defendants Stone and Stop the Steal;

      g. Otherwise organizing efforts to engage in voter intimidation.

(Doc. No. 14-1.)

At 1:59 a.m. this morning, Plaintiff filed an Amended Proposed Order, asking me to restrain and enjoin Defendants from:

      a.  Blocking the entrance to the polling place;

      b.  Asking voters for documentation when none is required;

      c.  Disrupting voting lines inside and outside of the polling place;

      d.  Disseminating false or misleading election information;

      e.  Ostentatious showing of weapons at a polling place;

      f.  Photographing or videotaping voters to intimate [sic] them;

      g.  Frivolous challenges to voters that are made without a stated good faith basis;

      h.  Verbal or physical confrontation of voters by persons dressed in official-looking uniforms;

      i.  Violence or using the threat of violence to interfere with a person's right to vote.

(Doc. No. 34.)  Plaintiff also asks me to order Stone and STS to abide by and distribute guidelines that those Defendants have purportedly proposed.  (See id. at 2.)

On November 4, the Ohio District Court granted what appeared to be a nationwide injunction prohibiting Defendants Trump Campaign, Mr. Stone, STS, as well as other non-party "individuals or groups, including groups associated with the Clinton for Presidency [sic] campaign," from violating the law.  (Doc. No. 30-4.)  But see Perez v. Ohio Bell Tel. Co., No. 15-3303, 2016 WL 3755795, at *6 (6th Cir. July 14, 2016) ("The Supreme Court has warned

against 'sweeping injunction[s] to obey the law' and has cautioned courts about their 'duty to avoid' such orders." (quoting <u>Swift & Co. v. United States</u>, 196 U.S. 375, 401 (1905))). Yesterday, the Sixth Circuit stayed the injunction, finding that the District Court had abused its discretion because the plaintiff (the Ohio Democratic Party) had not demonstrated it was likely to succeed on the merits of its suit.  (Doc. No. 30-5.)

On the same day the Ohio Court issued its injunction, the Arizona District Court denied all relief.  (Doc. No. 30-3.)  The Nevada District Court denied relief against Trump and the state Republicans, deferring a ruling on Mr. Stone and STS pending a hearing to be held this afternoon.  (Doc. No. 30-2.)

Today, the Middle District of North Carolina held oral argument in the suit there. (<u>See</u> No. 16-1288, Doc. No. 7 (M.D.N.C. Nov. 5, 2016.)  As of this writing, there has been no substantive activity in the Michigan case.  (<u>See</u> No. 16-13924 (E.D. Mich.).)

Finally, sometime yesterday, Plaintiff subpoenaed RPP Chairman Rob Gleason—who resides some 240 miles away in Johnstown—to appear at the hearing this morning (the day before Election Day) and bring with him, *inter alia*, all Republican Party documents relating to its poll watching activities.  Because the subpoena is vexatious and abusive, I granted the RPP's Motion to Quash earlier this morning.  (<u>See</u> Doc. Nos. 32, 38.)

**II.    Standing**

Plaintiff alleges that it is "a state party organization affiliated with the [National] Democratic Party," and that it "works 'to elect Democrats from the top of the ticket on down' in local, county, state, and federal elections."  (Doc. No. 1 ¶ 7 (citation omitted).)  Defendants do not dispute that Plaintiff has standing to bring the instant suit, which is intended to protect the interests of both Democratic candidates running for office and Democratic voters.  (<u>Id.</u> ¶ 14.)  I

agree that Plaintiff has standing to proceed.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 180 (2000); Warth v. Seldin, 422 U.S. 490, 511 (1975); Constitution Party of Pa. v. Aichele, 757 F.3d 347, 368 (3d Cir. 2014).

### III.  Legal Standards

#### A.  Preliminary Injunction

Rule 65 authorizes me to issue the injunctive relief Plaintiff seeks.  See Fed. R. Civ. P. 65(a).  "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (quoting 11A Wright & Miller, Fed. Prac. & Proc. § 2948 (3d ed. Apr. 2016)).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (citations omitted). The moving party bears the "heavy burden" of showing that these elements weigh in favor of a preliminary injunction.  Republican Party of Pa. v. Cortés, No. 16-5524, 2016 WL 6525409, at *4 (E.D. Pa. Nov. 3, 2016) (citing Ferring Pharms., Inc. v. Watson Pharms., Inc., 765 F.3d 205, 210 (3d Cir. 2014), and Punnett v. Carter, 621 F.2d 578, 588 (3d Cir. 1980)).

#### B.  Voting Rights Act of 1965

Section 11(b) of this Act, as amended and codified, provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote."   52 U.S.C. § 10307(b); see also 28 U.S.C. § 1343(a)(4) (providing private cause of action "under any Act of

Congress providing for the protection of civil rights, including the right to vote").

### C. Civil Rights Act of 1871

This Act, as amended and codified, provides that

> if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

### IV. Discussion

As Judge Pappert recently stated in rejecting the RPP's belated request for Election Day injunctive relief: "There was no need for this judicial fire drill and Plaintiff[] offer[s] no reasonable explanation or justification for the harried process [it] created." Cortés, 2016 WL 6525409, at *4. The same situation obtains here. Plaintiff has not explained what it learned in the last month or even the last week that created emergent conditions. On the contrary, Plaintiff has long known of the acts and statements on which it bases its claims. For instance, Plaintiff emphasizes an inapposite 2004 Complaint and TRO filed against Senator John Thune, seeking to enforce the District of New Jersey's 1982 and 1987 Consent Orders. (Doc. Nos. 14-21, 14-23.) Plaintiff also points to purported voter intimidation by the Republican mayoral candidate during Philadelphia's 2003 election. (Doc. No. 14-19 at 7-8.) Plaintiff also offers comments ostensibly made by Mr. Trump going back to early August. (See, e.g., Doc. Nos. 14-9, 14-12.)

During today's hearing, I repeatedly asked Plaintiff to explain its dilatory conduct and to identify any recent occurrence that compelled it to seek emergency relief so close to Election Day. Plaintiff was unable to do so. Significantly, Plaintiff has not alleged that Defendants have

intimidated voters in the four states that allow early voting—Arizona, Nevada, North Carolina, and Ohio—where suits identical to the instant suit have been filed. Plaintiff has not explained why it filed its Emergency Motion only two business days before the election—again, only after I ordered it to do so. (See Doc. No. 10.) Nor has Plaintiff explained why it failed to seek expedited discovery, opting yesterday instead to subpoena Mr. Gleason and a cache of documents. Remarkably, during today's hearing, Plaintiff stated that it had not sought expedited discovery because it believed that Defendants would voluntarily produce all discoverable materials without being formally asked to do so.

Plaintiff's dilatory conduct "weighs decidedly against granting the extraordinary relief [it] seek[s]"—especially "where, as here, an election is looming." Cortés, 2016 WL 6525409, at *3 (citing United States v. City of Phila., No. 06-4592, 2006 WL 3922115, at *2 (E.D. Pa. Nov. 7, 2006) (citing in turn Purcell v. Gonzalez, 549 U.S. 1 (2006))); see also Crookston v. Johnson, No. 16-2490, 2016 WL 6311623, at *2 (6th Cir. Oct. 28, 2016) ("Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so."). The election will be underway in a matter of hours.

Plaintiff's failure to take discovery has compelled it to rely almost entirely on media reports. Because the Federal Rules of Evidence do not strictly apply during preliminary injunction proceedings, I must exercise discretion in "weighing all the attendant factors, including the need for expedition, to assess whether, and to what extent, affidavits or other hearsay materials are appropriate given the character and objectives of the injunctive proceeding." Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 719 (3d Cir. 2004) (internal quotation marks and citation omitted).

The plaintiff seeking an injunction will typically support her request with an affidavit, verifying that the facts alleged are true and correct according to her best information, knowledge, and belief. See Fed. R. Civ. P. 65(b)(1)(A) (requiring "specific facts in an affidavit or a verified complaint [that] clearly show that immediate and irreparable injury, loss, or damage will result to the movant" for TRO); 11A Wright & Miller, Fed. Prac. & Proc. § 2949 (3d ed. Apr. 2016) ("Affidavits are appropriate on a preliminary-injunction motion and typically will be offered by both parties. . . . All affidavits should state the facts supporting the litigant's position clearly and specifically." (footnote omitted)).

Plaintiff has produced its evidence in an Appendix comprising online newspaper articles and other reports and statements—almost all having nothing to do with this District. (See Doc. Nos. 14-6, 14-7, 14-9, 14-11, 14-12, 14-13, 14-14, 14-15, 14-16, 14-17, 14-18, 14-19, 14-20, 14-22, 14-24, 14-25, 14-27.) The Appendix is "verified" by one of Plaintiff's lawyers, who avers only that the exhibits are accurate copies. (See Doc. No. 14-3.) He says nothing about the truth of their content. (See id.)

I am thus compelled to base a ruling that could restrict Defendants' Election Day speech and conduct on media reports because Plaintiff has contrived to transform this litigation into a mad scramble. Although I could deny relief on this ground alone, given the importance of the voting rights Plaintiff alleges are threatened, I will consider all the Winter factors. See Cortés, 2016 WL 6525409, at *1 (citing unreasonable delay as a basis for denying injunctive relief); Smart Vent Prods., Inc. v. Crawl Space Door Sys., Inc., No. 13-5691, 2016 WL 4408818, at *12 (D.N.J. Aug. 16, 2016) (delay "knocks the bottom out of any claim of immediate and irreparable harm").

## A. Likelihood of Success on the Merits

To make out this factor, "the plaintiff need only prove a *prima facie* case, not a certainty that he or she will win." Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001). The Third Circuit has held that "a sufficient degree of success for a strong showing exists if there is a 'reasonable chance, or probability, of winning.'" In re Revel AC, Inc., 802 F.3d 558, 568-69 (3d Cir. 2015) (quoting Singer Mgmt. Consultants, Inc. v. Milgram, 650 F.3d 223, 229 (3d Cir. 2011) (en banc)). Plaintiff alleges that the Trump Campaign, Mr. Stone, STS, and the RPP "are conspiring to threaten, intimidate, and thereby prevent minority voters in urban neighborhoods from voting in the 2016 election." (Doc. No. 14-2 at 2.) Like the Arizona and Ohio Democratic Parties, Plaintiff here has not made the requisite "clear showing" that it will prevail on the merits of its claims.

To succeed on its Voting Rights Act claim, Plaintiff must show that Defendants acted or attempted "to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). To succeed on its Civil Rights Act claim, Plaintiff must show that Defendants conspired to do so. 42 U.S.C. § 1985(3). Plaintiff has not demonstrated a likelihood of succeeding on either claim.

Plaintiff relies heavily on Defendants' alleged statements as reported in online newspaper articles. These statements were made in connection with the upcoming election. See Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 339 (2010) ("Speech is an essential mechanism of democracy . . . . The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." (internal quotation marks and citations omitted)). Once again, virtually none of the statements was made in this District or suggested that any illegal activity would occur in this District. Moreover, as the Arizona District Court found, some

10

of these statements are taken grossly out of context. (Doc. No. 30-3 at 16.) The same is true

here. For example, Plaintiff opens its brief with the following claim:

> The stated goal of the Trump Campaign, as explained by an unnamed official to
> Bloomberg News on October 27, 2016, is to depress voter turnout, and
> particularly minority voter turnout—in the official's words: "We have three
> major voter suppression operations under way."

(Doc. No. 14-2 at 2 (quoting Doc. No. 14-11).) Plaintiff thus suggests that these "major voter

suppression operations" are targeted at intimidating minority voters. In context, however, it is

clear that the "unnamed official" is plainly describing protected political activity:

> "We have three major voter suppression operations under way," says a senior
> official. They're aimed at three groups Clinton needs to win overwhelmingly:
> idealistic white liberals, young women, and African Americans. Trump's
> invocation at the debate of Clinton's WikiLeaks e-mails and support for the
> Trans-Pacific Partnership was designed to turn off Sanders supporters. The
> parade of women who say they were sexually assaulted by Bill Clinton or
> harassed or threatened by Hillary is meant to undermine her appeal to young
> women. And her 1996 suggestion that some African American males are "super
> predators" is the basis of a below-the-radar effort to discourage infrequent black
> voters from showing up at the polls—particularly in Florida.

(Doc. No. 14-11 at 6-7.) In context, these are not "suppression" efforts at all, and they do not

appear designed to threaten or intimidate voters. Rather, they are coarse efforts to convince

Secretary Clinton's likely supporters not to vote for her.

Plaintiff also points to the Trump Campaign's "signup form on its website for supporters

to sign up to be 'Trump Election Observers' in order to stop 'Crooked Hillary From Rigging this

Election.'" (Doc. No. 14-2 at 4 (quoting Doc. No. 14-5).) Plaintiff thus alleges that Mr. Trump

is "further encouraging his supporters to join in a common plan to 'watch' voters in 'certain

areas' of states like Pennsylvania for voter fraud." (Id.) Yet, Pennsylvania law allows poll

watching, and Plaintiff has not shown that the poll watching proposed here will include any

impermissible activity. See Cortés, 2016 WL 6525409, at *1-2 (describing the Pennsylvania

Election Code's poll-watching provisions (citing 25 P.S. § 2687)).  Indeed, Defendants point out that the Clinton campaign is engaged in the same exercise.  (Doc. No. 41 at 11); see Join Victory Counsel, HillaryClinton.com, https://www.hillaryclinton.com/forms/protect-the-vote ("Volunteer to protect the vote as a poll observer this election cycle.") (last visited Nov. 7, 2016).

To show the "conspiracy" between Defendants RPP and Trump Campaign, Plaintiff offers an August 3, 2016 statement purportedly made by Governor Pence at a town hall event: "[T]he Trump campaign and the Republican National Committee are working very, very closely with state governments and secretaries of states all over the country to ensure ballot integrity." (Doc. No. 14-2 at 10 (quoting 8-3 Replay:  Pence Denver Rally Town Hall at 16:22-17:27, TrumpTube.tv, http://trumptube.tv/donald-trump-rally-speech-video/video/pence-live-stream-town-hall-8-3-16).)  Similarly, Plaintiff offers RPP Chairman Gleason's early-August statement to the Washington Post that he was "glad to hear" that Mr. Trump was becoming focused on voter fraud and "taking additional measures to recruit poll watchers in Philadelphia," as well as the RPP's now-unsuccessful effort to invalidate restrictions on Pennsylvania poll watchers. (Doc. No. 14-2 at 10-11 (citing Doc No. 14-9 and Complaint, Cortés, No. 16-5524, Doc. No. 1 (E.D. Pa. Oct. 21, 2016).)  Assuming these purported statements accurately reflect actions that have actually been taken, no voter intimidation is even suggested.  Once again, the Pennsylvania Election Code explicitly allows candidates and political parties to appoint poll watchers who "help 'guard the integrity of the vote.'"  See Cortés, 2016 WL 6525409, at *1-2 (quoting Tiryak v. Jordan, 472 F. Supp. 822, 824 (E.D. Pa. 1979)); 25 P.S. § 2687.

As to Mr. Stone and STS, Plaintiff alleges that they "are actively recruiting Trump supporters for 'exit polling,' specifically targeting nine Democratic-leaning cities with large minority populations, including Philadelphia."  (Doc. No. 14-2 at 6 (citing Doc. No. 14-6).)  Mr.

Stone and STS have purportedly signed up 2822 volunteers to engage in "exit polling," including 150 volunteers in Pennsylvania. (Id.)  Yet, it is not clear that STS is even operational.  See Robert Kuniegel, Where Is the Training for Exit Polls[?], Stop the Steal (Oct. 29, 2016), https://stopthesteal.org/where-is-the-training-for-exit-polls ("I have no idea where this post is going or if anyone will see it.  I suspect that no one will.  I have 10 people that wish to do exit polling in Philly and have tried for one month to find a way to get assigned and or trained.").  In any event, "the act of exit polling . . . constitute[s] protected expressive speech" under the First Amendment.  See PG Pub. Co. v. Aichele, 705 F.3d 91, 100-01 (3d Cir. 2013) (citing Daily Herald Co. v. Munro, 838 F.2d 380, 382 (9th Cir. 1988)); see also Daily Herald Co., 838 F.2d at 384 ("[E]xit polling constitutes speech protected by the First Amendment, not only in that the information disseminated based on the polls is speech, but also in that the process of obtaining the information requires a discussion between pollster and voter.").  As the Arizona District Court concluded, exit polling is permissible even if it is not "scientific" and those conducting it are not professional pollsters.  (See Doc. No. 30-3 at 19.)

Finally, Plaintiff alleges that the conspiracy to intimidate minority voters "reaches beyond the defendants," discussing at length the activities of "white nationalist, alt-right, and militia movement groups" that have been "[e]nergized by Trump's candidacy."  (See Doc. No. 14-2 at 11-12 (citing Doc. No. 14-25).)  Unless it is psychic, Plaintiff has no idea who might have been "energized by" Mr. Trump.  Plaintiff's heated suggestion does not even rise to the level of speculation.

In sum, Plaintiff has not shown that any Defendant has engaged or will engage in voter intimidation in this District, an essential element of both of Plaintiff's claims.  Plaintiff has thus failed to demonstrate that it is likely to succeed on the merits of either claim.

## B. Likelihood of Irreparable Harm

I agree with Plaintiff that a violation of voting rights would work an irreparable harm for which there is no adequate remedy at law. See Council of Alt. Political Parties v. Hooks, 121 F.3d 876, 883 (3d Cir. 1997) (infringement on voting rights "cannot be alleviated after the election"). I also agree with Plaintiff that given this nation's troubled history, the federal courts must take special care to protect the voting rights of minority communities. As I have discussed, however, Plaintiff has not made out even the possibility—much less the likelihood—that Defendants will intimidate *any* voters in this District.

During today's hearing, Plaintiff called Reverend Mark Kelly Tyler of Mother Bethel A.M.E. Church and former Philadelphia Councilman Angel L. Ortiz. Neither witness knew of any actual voter intimidation efforts or of any voters who had actually been intimidated. Rather, both were concerned that Mr. Trump's statements "might" or "could" intimidate African-American or Latino voters. This is not proof of the likelihood of harm. See ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987) ("Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" (citation omitted)).

## C. Balance of Equities and the Public Interest

Because these factors are intertwined, I consider them together. To prevent unproven voter intimidation, Plaintiff asks me to curtail Defendants' right to free expression and speech. U.S. Const., amend. I; Citizens United, 558 U.S. at 326-27 ("Courts, too, are bound by the First Amendment . . . [and] must give the benefit of any doubt to protecting rather than stifling speech." (internal quotation marks and citation omitted)); id. at 340 ("[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence."). Yet, virtually

all the minatory acts Plaintiff asks me to enjoin are already proscribed by criminal statutes, subject to severe punishment.  See, e.g., 18 U.S.C. § 594 (actual or attempted intimidation, threats, or coercion in federal elections punishable by up to one year's imprisonment and a fine); 25 P.S. §§ 3527 (interference with election officials, blocking the entrance of a polling place, voter intimidation, various acts of voter fraud, and conspiracy punishable by up to seven years' imprisonment and a $15,000 fine), 3528 (voter intimidation at a polling place at which one is not entitled to vote punishable by up to seven years' imprisonment and a $15,000 fine), 3547 (use or threat of force or duress punishable by up to two years' imprisonment and a $5000 fine), 3552 (punishing any person convicted of willfully violating the Election Code with four years' disenfranchisement).  Moreover, any coordinated efforts (much less a "conspiracy") between the Trump Campaign and STS would violate federal election law.  See, e.g., 52 U.S.C. § 30116(a)(7); 26 U.S.C. § 527.

The Supreme Court has long cautioned courts about their "duty to avoid" issuing "sweeping injunction[s] to obey the law."  Swift & Co., 196 U.S. at 401; see also Belitskus v. Pizzingrilli, 343 F.3d 632, 650 (3d Cir. 2003) (injunction impermissibly "require[d] defendants 'to obey the law' in the future . . . a requirement with which they must comply regardless of the injunction" (quoting SEC v. Warren, 583 F.2d 115, 121 (3d Cir. 1978))).  That admonition is especially apposite here, where the broad injunction Plaintiff seeks would itself curtail the constitutional rights of Defendants.  For instance, Plaintiff asks me to enjoin Defendants from "disseminating false or misleading election information."  (Doc. No. 34.)  Virtually all "election information" could be deemed "false" or "misleading," depending on the beholder.  The broad prohibition Plaintiff seeks could thus effectively silence Defendants' political speech on Election Day.

In these circumstances, the balance of equities and public interest factors weigh against the issuance of a preliminary injunction.

## V.    Conclusion

Our Republic is premised on the right of its citizens to select their leaders.  Had Plaintiff made any credible showing—much less the required clear showing—that Defendants intended to jeopardize that right, I would not hesitate to take immediate action.  Plaintiff has made no such showing, however.  Its belated, inflammatory allegations appear intended to generate only heat, not light.  Presumably, that is why identical efforts have so far been rejected by the Arizona and Nevada District Courts and the Sixth Circuit.  I will also deny Plaintiff's eleventh-hour request for emergency injunctive relief.

An appropriate Order follows.

*/s/ Paul S. Diamond*

_____

Paul S. Diamond, J.

Exhibit D

—————2:16-cv-2415-RFB-NJK—————

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4   NEVADA STATE DEMOCRATIC        )
    PARTY,                         )   Case No. 2:16-cv-2415-RFB-NJK
5                                  )
                  Plaintiff,       )   Las Vegas, Nevada
6                                  )   Friday, November 4, 2016
            vs.                    )   3:00 p.m.
7                                  )
    NEVADA REPUBLICAN PARTY,       )   EXCERPT OF MOTION HEARING
8   DONALD J. TRUMP FOR            )   (RULING)
    PRESIDENT, INC., ROGER J.      )
9   STONE, JR., and STOP THE       )
    STEAL, INC.,
10
                  Defendants.
11   _____

12

13

14
                    REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
                    THE HONORABLE RICHARD F. BOULWARE, II,
16                       UNITED STATES DISTRICT JUDGE

17

18

19   APPEARANCES:            See the next page

20

21   COURT REPORTER:         Patricia L. Ganci, RMR, CRR
                             United States District Court
22                           333 Las Vegas Boulevard South, Room 1334
                             Las Vegas, Nevada  89101
23
     Proceedings reported by machine shorthand, transcript produced
24   by computer-aided transcription.

25

```
                        ─── 2:16-cv-2415-RFB-NJK ───
```

 1   APPEARANCES:

 2   For the Plaintiff:
             **DON SPRINGMEYER, ESQ.**
 3           WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN
             3556 E. Russell Road, Second Floor
 4           Las Vegas, Nevada 89120
             (702)341-5200

 5
             **MICHAEL JULIAN GOTTLIEB, ESQ.**
 6           BOIES, SCHILLER & FLEXNER, LLP
             5301 Wisconsin Ave., Suite 800
 7           Washington, DC 20015
             (202)237-9617

 8

 9   For Defendants Nevada Republican Party and Donald J. Trump for
     President, Inc.:
10           **BRIAN R. HARDY, ESQ.**
             MARQUIS AURBACH COFFING
11           10001 Park Run Drive
             Las Vegas, Nevada 89145
12           (702)382-0711

13           **KORY LANGHOFER, ESQ.**
             STATECRAFT PLLC
14           649 North Fourth Avenue, Suite B
             Phoenix, Arizona 85003
15           (602)382-4078

16
     For Defendants Roger J. Stone, Jr. and Stop the Steal, Inc.:
17           **ADAM ROSS FULTON, ESQ.**
             JENNINGS & FULTON, LTD.
18           6465 W. Sahara Ave., #103
             Las Vegas, Nevada 89146
19           (702)979-3565

20           **PAUL ROLF JENSEN, ESQ.**
             JENSEN & ASSOCIATES, APC
21           650 Town Center Drive, 12th Floor
             Costa Mesa, California 92626
22           (714)662-5528

23

24

25

```

—— 2:16-cv-2415-RFB-NJK ——

1          LAS VEGAS, NEVADA; FRIDAY, NOVEMBER 4, 2016; 3:00 P.M.

2                            --oOo--

3                    P R O C E E D I N G S

4

5          THE COURT:  Okay.  So at this point in time the Court

6  is going to deny the motion for a Temporary Restraining

7  Order/Preliminary Injunction without prejudice as to the Nevada

8  Republican Party and the Donald J. Trump Campaign.  After

9  reviewing the record in the case, the Court does not find that

10  the plaintiffs have met their burden to be entitled to the

11  injunctive relief that they seek.  After reviewing the record

12  and testimony in the case, the Court preliminarily makes the

13  following findings.

14          The Court does not find that the Nevada Republican

15  Party has been or plans to be engaged in poll watching or

16  observing in this election cycle.  The Court finds that the

17  Nevada Republican Party has provided space for the Trump

18  Campaign and is aware of the campaign's poll watching program,

19  but that the Nevada Republican Party is not engaged in any

20  substantial coordinating or organizing activities regarding the

21  campaign's poll watching activities.

22          The Court finds that there is no evidence in the record

23  that the Nevada Republican Party is engaging in any activities

24  regarding exit polling.

25          The Court finds that the Trump Campaign does have an

─────────── 2:16-cv-2415-RFB-NJK ───────────

1   active and current program involving poll watching, that it

2   began training poll watchers around October 24, 2016, and that

3   it compiled a list of names of volunteers from its website and

4   other direct inquiries to create a list of poll watchers.

5          The Trump Campaign's poll watching program in Nevada is

6   overseen by Jesse Law, a former employee of the Nevada

7   Republican Party, who has no current responsibilities with or

8   for the Nevada Republican Party.  To date, Mr. Law has conducted

9   or participated in all of the polling training for all of the

10  campaign's poll watcher volunteers, and there have been

11  approximately a dozen training sessions and between 100 and 400

12  watchers trained.

13         For this training, Mr. Law received from the campaign's

14  national headquarters a PowerPoint slide presentation for

15  training and a poll watcher's guide.  The guide is handed out to

16  all potential poll watchers.  The PowerPoint is used for the

17  required in-person training to become a poll observer.

18         The initial PowerPoint-guided training sessions were

19  deficient and incomplete with respect to voter challenges.

20  While it does not appear that Mr. Law intentionally left out

21  information, the sessions had significant informational gaps.

22  Specifically, the initial training did not fully explain and

23  emphasize the requirements for asserting a voter challenge,

24  including that the challengers must have personal knowledge of

25  the facts that form the basis of the challenge, that the

——————— 2:16-cv-2415-RFB-NJK ———————

1   challenger would have to attest to such facts under penalty of

2   perjury, or that there could be civil or criminal penalties

3   regarding improper or false challenges.

4           However, on November 3rd in the morning the campaign

5   through Mr. Law sent out an e-mail to poll watchers addressing

6   these deficiencies in the initial poll training.  This e-mail

7   fully explained the requirements for voter challenges and

8   possible consequences for improper or false challenges.  It

9   emphasized that challenges were generally not likely and not

10  encouraged by the campaign.  It required poll watchers to

11  contact the campaign before initiating any challenge, and the

12  e-mail was, in fact, more restrictive than the legal

13  requirements themselves.

14          With respect to polling incidents at poll locations,

15  there is evidence of individuals who may have identified

16  themselves as Trump supporters improperly disrupting and

17  intimidating voters on one or two occasions in Las Vegas voting

18  locations.  There is, however, insufficient evidence or no

19  direct evidence linking these incidents to the campaign.  There

20  is no evidence or sufficient evidence in the record that the

21  campaign coordinated or directed any disruption of early voting

22  and no sufficient evidence that it intends to do so on Election

23  Day.

24          There is no evidence at all linking these incidents or

25  any other incidents to the Nevada Republican Party.  The Court

—— 2:16-cv-2415-RFB-NJK ——

1   has no basis for finding that these alleged incidents were

2   anything other than improper or unlawful acts carried out by

3   individuals potentially acting on their own.

4          There is no record of any voter challenges having been

5   made by the Nevada Republican Party or the campaign.  And there

6   is no evidence of improper voter challenges having been made --

7   any improper voter challenges having been made by the Nevada

8   Republican Party or the campaign.

9          Based upon these findings, the Court finds that there

10  is not a likelihood of success on the merits with respect to the

11  plaintiff's claim.  While the Court might have found that the

12  initial deficient poll watcher training combined with various

13  political statements might have led to circumstances in which

14  campaign poll watchers could have improperly challenged voters

15  leading to possible voter intimidation, the Court finds that the

16  e-mails sent by the campaign on November 3rd addressed any

17  issues or confusion that were created by the initial deficient

18  poll training.  Also, there is no evidence of voters having been

19  improperly challenged by campaign poll observers.

20         There is an insufficient factual basis for the

21  finding -- excuse me.  There is an insufficient factual basis

22  for finding that the two alleged incidents of voters being

23  harassed or intimidated resulted from campaign activities or

24  directions such that it would warrant the injunctive relief

25  sought by the plaintiffs.

───────── 2:16-cv-2415-RFB-NJK ─────────

1        There is no likelihood of success on the merits

2   regarding the Nevada Republican Party.  There is no evidence of

3   poll watching activity by the Nevada Republican Party.  There is

4   no evidence of voting challenges by the Nevada Republican Party,

5   and no connection between any alleged incidents of voter

6   intimidation and the Nevada Republican Party.  Therefore, there

7   would be no likelihood of success on the merits at this time as

8   it relates to the Nevada Republican Party.

9        Given the Court's finding, the Court does not find that

10  there would be irreparable harm as the defendants, specifically

11  the Nevada Republican Party and the Donald J. Trump Campaign,

12  are not involved as explained in activities that constitute

13  voter intimidation or coercion.  However, given the energy and

14  emotion around this election cycle, the Court remains concerned

15  about the possibility of voting disruptions without attributing

16  this possibility to any particular entity or party.

17        Therefore, the Court will set a hearing for Tuesday at

18  2:30 to address any new issues raised by parties in any filing

19  done by Tuesday at 1 p.m.  If no such filing occurs, the Court

20  will vacate the hearing at that time.

21        This lays out the Court 's reasoning for denying

22  without prejudice the motion for a Preliminary Injunction and

23  Temporary Restraining Order.  Does either party have any

24  comments about the Court's findings or any clarifications that

25  it seeks at this point in time?

————— 2:16-cv-2415-RFB-NJK —————

```
 1          MR. HARDY:  No, Your Honor.

 2          MR. GOTTLIEB:  No, Your Honor.

 3          THE COURT:  Okay.  So is there anything else that we

 4   need to do today?

 5          MR. GOTTLIEB:  Not from our perspective, Your Honor.

 6          MR. HARDY:  I'm assuming that order will be published

 7   just as soon as we get out of the courtroom today?

 8          THE COURT:  Well, it depends upon what else we have to

 9   do.  It may be published later.  The Court -- it's not clear to

10   me at this point in time, depending on what else we have to do,

11   whether or not I'm going to issue a more formal written ruling.

12   I don't know that I'm required to do that.  That's why I try to

13   be as explicit as I could be about the reasons why I was denying

14   the TRO and Preliminary Injunction.  I don't know that I

15   actually am required to issue a written ruling given the

16   explicit findings of the Court, Mr. Hardy, unless you think that

17   the Court needs to do that.

18          MR. HARDY:  I'm just curious because you seemed like

19   you'd read it.  I didn't know if you were reading it and you

20   were going to publish that order or if it would just be merely a

21   minute order that would come out.

22          THE COURT:  Well, it depends on how much work you all

23   have me do later on.

24          MR. HARDY:  You've dealt with us for three days, so I

25   don't want to push any farther.
```

—— 2:16-cv-2415-RFB-NJK ——

1      THE COURT:  If we're working together, we're working

2  together.  No, I did want to again give you all an opportunity,

3  that's why I read it in court, if you thought that there were

4  things that you wanted to comment on and suggest.  That's why I

5  read it in court and reviewed the findings in court.  I think

6  it's consistent with what I have said previously on the record

7  so far.

8      So I don't know if there's anything else that we would

9  need to address.  And so at this point in time I might issue a

10  minute order indicating whether or not I'm going to have a

11  separate written order or simply rely upon the transcript.  I

12  don't know if there's any other legal basis that the Court would

13  need to lay out in terms of its consideration of the motion.

14      Is there anything else that you think would need to be

15  laid out, Mr. Hardy?

16      MR. HARDY:  No, you're great there, Your Honor.  Thank

17  you.

18      THE COURT:  Mr. Gottlieb?

19      MR. GOTTLIEB:  No, Your Honor.

20      THE COURT:  Okay.  So, remember, before you leave today

21  I would like all counsel to leave contact information, cell

22  phones, too, please.  We will not share that with the other side

23  unless you want us to, but please leave all contact information

24  such that you can be contacted over the weekend because I want

25  to be clear about something.  I don't really want to be in a

2:16-cv-2415-RFB-NJK

1   situation where any lawyer says, Well, we didn't get the message

2   until Monday morning.  We're going to send the messages on the

3   contact information that you provide.  So I expect that you will

4   all be checking it, as I will have to be checking, over the

5   weekend for anything that comes in.

6           Are we clear about that?

7           MR. SPRINGMEYER:  Yes, Your Honor.

8           MR. JENSEN:  Crystal clear, Your Honor.  But what time

9   are we coming back on Monday?

10          THE COURT:  Oh, you're right.  I did not set a time for

11  that.

12          (Court conferring with courtroom administrator.)

13          THE COURT:  1:30 on Monday, the 7th.

14          (Court conferring with law clerks.)

15          THE COURT:  Okay.  We are adjourned on this matter.

16  I'm going to stay on the bench for a few minutes.  Thank you.

17          (Whereupon the proceeding concluded at 4:06 p.m.)

18

19

20

21

22

23

24

25

─────2:16-cv-2415-RFB-NJK─────

```
 1                          --oOo--

 2              COURT REPORTER'S CERTIFICATE

 3

 4       I, PATRICIA L. GANCI, Official Court Reporter, United

 5  States District Court, District of Nevada, Las Vegas, Nevada,

 6  certify that the foregoing is a correct transcript from the

 7  record of proceedings in the above-entitled matter.

 8

 9  Date:  November 4, 2016.

10                              /s/ Patricia L. Ganci

11                              Patricia L. Ganci, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit E

**WO**                           NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Democratic Party, | No. CV-16-03752-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Arizona Republican Party, *et al.*, | |
| Defendants. | |

In response to what it alleges to be a call for the intimidation of voters in next week's presidential election by Donald J. Trump for President, Inc. ("Trump Campaign"), the Arizona Republican Party ("ARP"), Roger J. Stone, Jr., and Stop the Steal, Inc., the Arizona Democratic Party ("ADP") filed this lawsuit a mere eight days before the election. Plaintiff ADP seeks injunctive relief for violations of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), and Section 11(b) of Voting Rights Act of 1965, 52 U.S.C. § 10307(b). (Doc. 1, Compl.) After the Court set an expedited briefing and hearing schedule (Doc. 7), Plaintiff filed a Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 10, Mot.), Defendants ARP and the Trump Campaign filed a Response (Doc. 15, GOP Resp.), and Plaintiff filed a Reply thereto (Doc. 22, Reply to GOP).

Plaintiff was only able to serve Defendant Stop the Steal on November 2, 2016 (Doc. 19), the day its Response to Plaintiff's Motion would have been due, and Plaintiff did not file a certificate of service with regard to Defendant Mr. Stone prior to the

Hearing (*see* Doc. 22-1). On November 3, 2016, the Court held a Hearing on Plaintiff's Motion. (Doc. 24.) Stop the Steal and Mr. Stone appeared through counsel at the Hearing for the purpose of contesting both service and the Court's jurisdiction over them in this matter. The Court denied Stop the Steal's motion to dismiss and reserved judgment on that of Mr. Stone. (Doc. 24.) The Court heard evidence and argument from all parties on Plaintiff's Motion and ordered briefing from Stop the Steal. (Doc. 24.) On November 4, 2016, Stop the Steal and Mr. Stone filed a Response (Doc. 27, STS Resp.), and Plaintiff filed a Reply thereto (Doc. 28, Reply to STS).

Considering all the evidence and arguments of the parties and for the reasons that follow, the Court will deny Mr. Stone's Motion to Dismiss (Doc. 24) and deny Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 10).

## I.  LEGAL ANALYSIS

### A.  Standing

To bring a judicable lawsuit into Federal Court, Article III of the Constitution requires that one have "the core component of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To satisfy Article III's standing requirements, a plaintiff must show that he suffered a "concrete and particularized" injury that is "fairly traceable to the challenged action of the defendant," and that a favorable decision would likely redress the injury. *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). In the complaint, the plaintiff must "alleg[e] specific facts sufficient" to establish standing. *Schmier v. U.S. Court of Appeals for Ninth Circuit*, 279 F.3d 817, 821 (9th Cir. 2002). Accordingly, courts should dismiss a plaintiff's complaint if he has failed to provide facts sufficient to establish standing. *See, e.g., Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1123 (9th Cir. 2010).

An organization has standing "to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). An organization also has "associational standing" to bring suit on behalf of its members "when its members would otherwise have standing to

1    sue in their own right, the interests at stake are germane to the organization's purpose,

2    and neither the claim asserted nor the relief requested requires the participation of

3    individual members in the lawsuit." *Friends of the Earth, Inc.*, 528 U.S. at 181 (citing

4    *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

5         In the Complaint, Plaintiff alleges it has standing to bring this action both on

6    behalf of itself and its members "because it is supporting many candidates in the

7    Presidential, Senate, House, and numerous statewide elections" and will suffer immediate

8    and irreparable injury if Defendants' alleged conspiracy to intimidate voters "succeeds in

9    disrupting or changing the results of the election." (Compl. ¶ 14.) This is sufficient to

10   establish Plaintiff's standing, *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181,

11   189 n.7 (2008), and Defendants do not challenge Plaintiff's standing to bring its claims in

12   this matter.

13        **B.    Mr. Stone's Motion to Dismiss for Lack of Service and Jurisdiction**

14        At the Hearing, Mr. Stone, through counsel, moved to dismiss Plaintiff's claims

15   against him for lack of service and lack of jurisdiction.[1] (Tr. at 43.) Since then, Plaintiff

16   has filed a certificate of service with regard to Mr. Stone (Doc. 26), so the Court will

17   deny as moot his motion with regard to service. The Court addresses his motion with

18   regard to jurisdiction here.

19        In order for a federal court to adjudicate a matter, it must have jurisdiction over the

20   parties. *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982).

21   The party bringing the action has the burden of establishing that personal jurisdiction

22   exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citing

23   *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182-83 (1936)); *Data Disc, Inc.*

24   *v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). When a defendant

25   moves, prior to trial, to dismiss a complaint for lack of personal jurisdiction, the plaintiff

26   must "'come forward with facts, by affidavit or otherwise, supporting personal

27

28        [1] The Court denied a similar motion brought by Defendant Stop the Steal at the
     Hearing. (Tr. at 52.)

jurisdiction.'" *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir. 1986) (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)).

Because there is no statutory method for resolving the question of personal jurisdiction, "the mode of determination is left to the trial court." *Data Disc,* 557 F.2d at 1285 (citing *Gibbs v. Buck*, 307 U.S. 66, 71-72 (1939)). Where, as here, a court resolves the question of personal jurisdiction upon motions and supporting documents, the plaintiff "must make only a prima facie showing of jurisdictional facts through the submitted materials in order to avoid a defendant's motion to dismiss." *Id.* In determining whether the plaintiff has met that burden, the "uncontroverted allegations in [the plaintiff's] complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor." *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002) (citation omitted).

To establish personal jurisdiction over a nonresident defendant, a plaintiff must show that the forum state's long-arm statute confers jurisdiction over the defendant and that the exercise of jurisdiction comports with constitutional principles of due process. *Id.*; *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 269 (9th Cir. 1995). Arizona's long-arm statute allows the exercise of personal jurisdiction to the same extent as the United States Constitution. *See* Ariz. R. Civ. Proc. 4.2(a); *Cybersell v. Cybersell*, 130 F.3d 414, 416 (9th Cir. 1997); *A. Uberti & C. v. Leonardo*, 892 P.2d 1354, 1358 (Ariz. 1995) (stating that under Rule 4.2(a), "Arizona will exert personal jurisdiction over a nonresident litigant to the maximum extent allowed by the federal constitution"). Thus, a court in Arizona may exercise personal jurisdiction over a nonresident defendant so long as doing so accords with constitutional principles of due process. *Cybersell*, 130 F.3d at 416.

Due process requires that a nonresident defendant have sufficient minimum contacts with the forum state so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *see also Data Disc,*

557 F.2d at 1287. Courts recognize two bases for personal jurisdiction within the confines of due process: "(1) 'general jurisdiction' which arises when a defendant's contacts with the forum state are so pervasive as to justify the exercise of jurisdiction over the defendant in all matters;[2] and (2) 'specific jurisdiction' which arises out of the defendant's contacts with the forum state giving rise to the subject litigation." *Birder v. Jockey's Guild, Inc.*, 444 F. Supp. 2d 1005, 1008 (C.D. Cal. 2006).

Here, Plaintiff contends that the Court has specific jurisdiction over Mr. Stone through his actions in conjunction with and as a volunteer for Stop the Steal. The issue of whether specific jurisdiction will lie turns on the extent of the defendant's contacts with the forum and the degree to which the plaintiff's suit is related to those contacts. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1210 (9th Cir. 2006). The Ninth Circuit uses the following approach in making this evaluation: (1) the nonresident defendant must do some act in or consummate some transaction with the forum, or perform some act by which it purposefully avails itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable. *Data Disc*, 557 F.2d at 1287. All three requirements must be satisfied for the exercise of jurisdiction to comport with constitutional principles of due process. *Omeluk*, 52 F.3d at 270. The plaintiff bears the burden of establishing the first two prongs of the test. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). If the plaintiff does so, the burden shifts to the defendant to set forth a "compelling case" that the exercise of jurisdiction would be unreasonable. *Mavrix Photo, Inc. v. Brand Tech's., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)).

---

[2] Plaintiff does not attempt to provide facts to support a finding of general jurisdiction over Mr. Stone.

With regard to the first element, the plaintiff must show the defendant "either (1) 'purposefully availed' himself of the privilege of conducting activities in the forum, or (2) 'purposefully directed' his activities toward the forum." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006) (quoting *Schwarzenegger,* 374 F.3d at 802). The Ninth Circuit has explained that in cases involving tortious conduct, as here, the purposeful direction analysis is most commonly applied. *Mavrix Photo*, 647 F.3d at 1228. Purposeful direction is determined by using the "effects" test that was developed in *Calder v. Jones*, 465 U.S. 783, 789-90 (1984). The effects test requires that "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Yahoo!*, at 1206.

A defendant's intentional act in the forum state does not necessarily have to be wrongful or tortious. "In any personal jurisdiction case we must evaluate all of a defendant's contacts with the forum state, whether or not those contacts involve wrongful activity by the defendant." *Yahoo!*, 433 F.3d at 1207. Courts must consider "the extent of the defendant's contacts with the forum and the degree to which the plaintiff's suit is related to those contacts. A strong showing on one axis will permit a lesser showing on the other." *Id.* at 1210.

Plaintiff alleges and proffers some evidence that Mr. Stone and Stop the Steal have "engaged in the recruitment of individuals to come into the State of Arizona for the purpose of engaging in election monitoring and exit poll activities on Election Day in Arizona," including signing up 107 volunteers as of November 1, 2016, and that Mr. Stone has publicly and repeatedly tied himself to Stop the Steal. (Tr. at 47-50; Reply to STS at 3-6.) Though Mr. Stone's counsel argued that Mr. Stone is distinct from Stop the Steal in terms of these actions (Tr. at 46), Mr. Stone produced no evidence to contradict Plaintiff's evidence. The Court finds that, through the acts of recruiting and organizing exit poll takers to come to Arizona polling places, Mr. Stone has sufficient contacts with Arizona. Furthermore, it is undisputed that Plaintiff's claims arise from

- 6 -

1   those contacts. Because Mr. Stone made no argument that the Court's exercise of

2   jurisdiction would be unreasonable, the Court finds it has jurisdiction over Mr. Stone in

3   this matter. Accordingly, the Court will deny Mr. Stone's oral motion to dismiss on that

4   basis.

5         **C.    Plaintiff's Motion for Injunctive Relief**

6         The Supreme Court has observed that "a preliminary injunction is an extraordinary

7   and drastic remedy, one that should not be granted unless the movant, *by a clear showing*,

8   carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)

9   (internal quotation and citation omitted). "A plaintiff seeking a preliminary injunction

10  must establish that he is likely to succeed on the merits, that he is likely to suffer

11  irreparable harm in the absence of preliminary relief, that the balance of equities tips in

12  his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def.*

13  *Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted); *see also Garcia v. Google, Inc.*,

14  786 F.3d 733, 740 (9th Cir. 2015). The Ninth Circuit Court of Appeals, employing a

15  sliding scale analysis, has also stated that, where there are "serious questions going to the

16  merits" such that a plaintiff has not necessarily demonstrated a "likelihood of success," "a

17  hardship balance that tips sharply toward the plaintiff can support issuance of an

18  injunction, assuming the other two elements of the *Winter* test are also met." *Drakes Bay*

19  *Oyster Co. v. Jewell*, 747 F.3d 1073, 1085 (9th Cir. 2013) (internal quotations and

20  citations omitted).

21         **1.    Likelihood of Success on the Merits**

22         Plaintiff brings claims under both the Voting Rights Act and Ku Klux Klan Act.

23  Section 11(b) of the Voting Rights Act provides, "No person, whether acting under color

24  of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate,

25  threaten, or coerce any person for voting or attempting to vote" or "for urging or aiding

26  any person to vote or attempt to vote." 52 U.S.C. § 10307(b).[3] The statute does not

27

28         [3] ARP and the Trump Campaign argue that an action under Section 11(b) of the
    Voting Rights Act requires a showing that a defendant intended to intimidate, threaten or
    coerce or attempt to intimidate, threaten or coerce a person for voting or attempting to

exclude a private right of action for injunctive relief, as Plaintiff has brought here. *Allen v. State Bd. of Elections*, 393 U.S. 544, 555-56 & n.18 (1969); *see also* 28 U.S.C. § 1343(a)(4).

The Ku Klux Klan Act provides that an injured party has a right of action for recovery of damages against a person who, with another person, "conspire[s] to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States." 42 U.S.C. § 1985(3).[4]

Arizona law also includes an anti-voter intimidation provision, which states it is a class 1 misdemeanor for a person, directly or indirectly, to knowingly "practice intimidation" or "inflict or threaten infliction" of "injury, damage, harm or loss" in order "to induce or compel" a voter "to vote of refrain from voting for a particular person or measure at any election provided by law, or on account of such person having voted or refrained from voting at an election." A.R.S. § 16-1013. In addition, Arizona more stringently controls the area within 75 feet of a polling place as posted by election officials. A.R.S. § 16-515. At any time the polls are open (except for the purpose of voting and for election officials), only "one representative[5] at any one time of each

---

vote. (GOP Resp. at 22 (citing *Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir. 1985)).) Plaintiff argues that an action under Section 11(b) only requires that a defendant intended to act, with the result that the actions intimidate, threaten or coerce or attempt to intimidate, threaten or coerce a person for voting or attempting to vote. (Reply to GOP at 4 (citing Section 11(b) of the Voting Rights Act); Reply to STS at 7-9.) While the Court agrees with Plaintiff that the plain language of the statute does not require a particular *mens rea*, the Court need not decide this question to resolve Plaintiff's Motion.

[4] ARP and the Trump Campaign argue that an action under 42 U.S.C. § 1985(3) requires a showing of racial animus and that the specific provision invoked by Plaintiff— the "support and advocacy clause"—cannot be applied against a non-state actor. (GOP Resp. at 17-19.) Plaintiff disagrees on both counts. (Reply to GOP at 4-8.) Again, the plain language of the statute does not require either of the elements proposed by ARP and the Trump Campaign. For the purpose of resolving Plaintiff's Motion, the Court presumes application of the "support and advocacy clause," like the other clauses in 42 U.S.C. § 1985(3), to ARP and the Trump Campaign as non-state actors. The Court need not read into the statute a racial animus requirement to resolve Plaintiff's Motion.

[5] For the purposes of this Order, the Court refers to these representatives provided

- 8 -

political party represented on the ballot who has been appointed by the county chairman of that political party and the challengers allowed by law" may be present within the 75-foot limit, and "[v]oters having cast their ballots shall promptly move outside" the 75-foot limit. A.R.S. § 16-515(A). Election officials, party representatives and challengers authorized by law to be within the 75-foot limit "shall not wear, carry or display materials that identify or express support for or opposition to a candidate, a political party or organization, a ballot question or any other political issue and shall not electioneer" within the 75-foot limit. A.R.S. § 16-515(F). The statute defines "electioneering" as expressing support for or against a political party, candidate or ballot measure "knowingly, intentionally, by verbal expression and in order to induce or compel another person to vote in a particular manner or refrain from voting." A.R.S. § 16-515(I). The statute also provides that no person shall take photographs or videos while within the 75-foot limit. A.R.S. § 16-515(G). A violation of any of these provisions is a class 2 misdemeanor. A.R.S. § 16-515(H).

For Plaintiff's claim under the Voting Rights Act, Plaintiff must demonstrate that Defendants acted or attempted to intimidate, threaten or coerce a person for voting or attempting to vote; similarly, for Plaintiff's claim under the Ku Klux Klan Act, Plaintiff must demonstrate that Defendants conspired to prevent a person from voting through force, intimidation or threat. Plaintiff claims that Defendants' statements to their constituents urging them to be present and observe the activities of other voters at polling places, to follow other voters and interrogate them as to their votes, to record other voters' license plates, to photograph and video-record other voters, and to call 911 if they suspect someone has engaged in voter fraud constitute at least an attempt to intimidate and/or threaten voters for voting or attempting to vote. (*E.g.*, Compl. ¶¶ 49, 51, 58.) Plaintiff also claims that the plan by Mr. Stone and Stop the Steal to conduct exit polls at

---

for by statute and duly appointed as "credentialed poll watchers." The Court refers to those persons present to observe activities at a polling place who are not appointed under the statute as "uncredentialed observers."

carefully selected polling places is merely a pretext for intimidating minority voters. (*E.g.*, Compl. ¶¶ 36-39.)

### a.    Statements of the Arizona Republican Party

In conjunction with its claims against ARP, Plaintiff proffers evidence that, in a press release, ARP Chairman Robert Graham stated that the party's credentialed poll watchers "will be the eyes and ears of the GOP to look for those who show up with multiple ballots." (Doc. 11-2 at 6-8, Gonski Decl. Ex. 2.) Acknowledging that state law prohibits talking to voters or taking photographs in polling places, Mr. Graham stated that credentialed poll watchers are "still free to follow voters out into the parking lot, ask them questions, take their pictures and photograph their vehicles and license plate." (Gonski Decl. Ex. 2.) ARP spokesman Tim Sifert added that credentialed poll watchers are "free to go outside that 75-foot limit" and "[t]hat's where they can turn on their phone to take video or pictures or something like that." (Gonski Decl. Ex. 2.) Mr. Graham also stated that, if they believe a felony is in progress, credentialed poll watchers can call 911. (Gonski Decl. Ex. 2.) Plaintiff claims that these statements amount to a call for ARP's credentialed poll watchers to intimidate voters at polling places. Moreover, Plaintiff points to evidence that ARP is flooded with requests from people who would like to become credentialed poll watchers in the upcoming election—some of whom, Plaintiff asserts, the Trump Campaign recruited—to argue that ARP is cooperating with the Trump Campaign to intimidate voters on a wide scale.

Mr. Graham and Mr. Sifert made their statements in the context of a new Arizona law, A.R.S. § 16-1005(H)-(I), which prohibits a practice called "ballot harvesting," or collecting other people's ballots (with some exceptions, including family members and caregivers) and delivering them to polling places.[6] The press release makes the context of the ARP officials' statements clear; Mr. Graham states that the ARP's credentialed poll watchers are looking "for those who show up with multiple ballots." (Gonski Decl.

---

[6] The day after the Hearing, an *en banc* panel of the Ninth Circuit Court of Appeals ruled that the statute is constitutionally infirm and struck it down in Ninth Circuit Case No. 16-16698, Order dated Nov. 4, 2016. (*See* Reply to STS at 2.)

Ex. 2.) Contrary to Plaintiff's suggestion, nothing in these officials' statements to the press indicates that ARP is training or otherwise instructing its credentialed poll watchers, or anyone else, to follow voters to their cars or take their photographs for reasons other than suspected ballot harvesting. Both officials also state that Arizona law prohibits talking to voters or taking photographs at polling places, that is, within the 75-foot limit. (Gonski Decl. Ex. 2; *see also* Doc. 25, Transcript of Nov. 3, 2016 Hearing ("Tr.") at 71-72.)

At the Hearing, Mr. Graham testified that the Arizona Republican Lawyers Association ("ARLA") trains ARP's credentialed poll watchers and is responsible for the contents of the training manual. (Tr. at 58, 64-65.) He confirmed that ARP has received requests from approximately 1,000 people to be poll watchers for this election, compared to approximately 200 in past elections, but that ARP does not have the resources to train all of those interested before this election and those not trained will not become credentialed poll watchers. (Tr. at 59, 69.) Mr. Graham stated that in his time with ARP, there has never been an issue with credentialed poll watchers acting improperly in past elections. (Tr. at 71.) He also stated that ARP's credentialed poll watching program is provided for by law—the same as in past elections—and that ARP is not coordinating with the Trump Campaign or anyone else to organize any other poll watching activities. (Tr. at 57, 68, 71, 76-77.) Indeed, Mr. Graham testified that he had never heard of Stop the Steal or Mr. Stone before this lawsuit. (Tr. at 73-74.) Mr. Graham confirmed that his statements in the press were specifically aimed at the new ballot harvesting law and that, if the Ninth Circuit strikes down the ballot harvesting prohibition, ARP would instruct credentialed poll watchers not to photograph voters dropping off multiple ballots.[7] (Tr. at 72.) The Court heard no evidence of a broad conspiracy to intimidate voters through poll watching, as claimed by Plaintiff, or a plan by ARP to train or otherwise organize poll watchers with the Trump Campaign, Stop the Steal or Mr. Stone.

---

[7] After the Ninth Circuit did strike the ballot harvesting law, ARP filed a Notice (Doc. 30-2) that it was informing its credentialed poll watchers via its website not to follow or photograph voters suspected of ballot harvesting or, indeed, any voter.

Walter Opaska testified on behalf of ARLA, which has taken on the responsibility of training credentialed poll watchers for the Republican Party in Arizona. (Tr. at 81.) Mr. Opaska stated that ARLA trains credentialed poll watchers never to talk to or confront voters and not to lodge a "challenge" as provided for by law against any voter. (Tr. at 87-88.) Mr. Opaska stated that credentialed poll watchers do not have the authority to enforce the now stricken ballot harvesting law, or any other law, and if they suspect a voter is breaking the law, they are to report it to the elections inspector. (Tr. at 88-90.) He tells credentialed poll watchers that they may discreetly take photos or videos of a person suspected of breaking the law outside the 75-foot limit but never to interact with a voter. (Tr. at 87, 90-91.) While the training manual for credentialed poll watchers states that a voter could be suspected of ballot harvesting if he or she brings in three or more ballots, Mr. Opaska stated that he instructed credentialed poll watchers only to be suspicious of voters who come to the polling place with "10, 20, a box load of ballots"—an instruction that is no longer meaningful in the absence of a ballot harvesting prohibition. (Tr. at 86, 90.) He stated that, in the years he has been involved in the program, there has never been a report that a credentialed poll watcher for the Arizona GOP challenged a voter. (Tr. at 94.) The Court heard no evidence that ARP is affiliated with training poll watchers to engage in any activities that would on their face constitute intimidation, threat, coercion or force against any voter for voting or attempting to vote.

In its brief filed after the Hearing, Plaintiff provides a screen-shot of a page from ARP's website that states, "If you observe anything improper or illegal at the polls on Election Day please use this form to report it to the Arizona Republican Party. Submit any photos, videos, or other materials as evidence. Thank you for your service to ensure the integrity of elections in Arizona!" (Reply to STS at 3; Ex. 3.) Plaintiff argues that this statement contemplates activity beyond that which ARP claims it proscribes, both by encouraging members of the public to be uncredentialed observers at polling places by taking photos or videos of perceived illegal activity and by failing to advise uncredentialed observers that no photos or videos can be taken within the 75-foot limit.

(Reply to STS at 3.) On its face, there is nothing untoward about telling members of the public to say something if they witness the law being broken, and ARP's website does not exhort action for any specific perceived crime or against any specific type of person or group. The Court thus sees no obvious tie between the statement on the website and intimidation, threat, coercion or force against any voter for voting or attempting to vote. Moreover, Arizona law already provides that no photographs or videos can be taken within the 75-foot limit—a rule that everyone is obligated to follow—and ARP's website is not telling uncredentialed observers to break the law.[8]

Plaintiff likens ARP's statements regarding following and photographing a narrow group of voters suspected of ballot harvesting or breaking the law to actions that the District of South Dakota enjoined in the context of a prior election in *Daschle v. Thune*, No. 04-CV-4177 (D.S.D. Nov. 2, 2004). There, the court received evidence that individuals acting on behalf of the defendants in that case followed Native American voters from the polling places and copied or otherwise recorded their license plate numbers, and that the conduct resulted in intimidation of Native American voters, particularly through the resulting word of mouth among the Native American population. *Id.* The two cases are not similar, however. There, the defendants had already taken actions against a group of voters that the group already perceived as intimidation, and the court had evidence that defendants' actions were likely to suppress the vote. Here, Plaintiff produced no evidence that ARP's actions will result in voter intimidation. Indeed, although ARP publicly condoned the idea that its credentialed poll watchers could follow and photograph a voter outside the 75-foot limit in the narrow instance in which the voter was suspected of violating Arizona's new ballot harvesting law, that law is no longer valid. Credentialed poll watchers are trained not to talk to, confront, or interact in any way with the voter. ARP's public statements with regard to following and photographing voters outside the 75-foot limit were made only in the context of helping

---

[8] After the Ninth Circuit struck the ballot harvesting law, ARP filed a Notice declaring that it removed the subject page from its website. (Doc. 30-2.)

law enforcement enforce the now-invalid ballot harvesting law and could not reasonably have been read to address voters generally, much less intimidate them. Moreover, credentialed poll watchers for both political parties are established and regulated by Arizona law, and there is no evidence of even a single incident between a credentialed poll watcher and voter since at least 2006—the period of time Mr. Opaska has been involved with the ARLA credentialed poll watcher training.

With regard to the statement on ARP's website, it is tailored to recording somebody suspected of breaking the law and it is not on its face tied to voter intimidation. The Court also heard no evidence of coordination between ARP and the other Defendants such that statements of the other Defendants could be tied to ARP. As a result, the Court cannot find that Plaintiff is likely to succeed in showing ARP's statements constitute intimidation, threat, coercion or force against voters for voting or attempting to vote in violation of the Voting Rights Act and/or the Ku Klux Klan Act.

### b.    Statements of the Trump Campaign

In its pleadings, moving papers and presentation to the Court, Plaintiff identified various statements made by the candidate, his surrogates and campaign officials that, it argues, show both an intent on the part of the Trump Campaign to intimidate voters and intimidation in fact. Plaintiff pointed to an unnamed Trump Campaign official recently telling reporters that "[w]e have three major voter suppression operations under way," which Plaintiff summarized as targeting "Latinos, African Americans, and other groups of voters." (Compl. at 1.) It introduced news articles relating Mr. Trump's own statements at campaign rallies and before the media that the election is "rigged" and that widespread voter fraud will favor his opponent. Plaintiff relates additional statements by Mr. Trump to his supporters that, "[a]s opposed to somebody coming up and voting 15 times for Hillary[,] I will not tell you to vote 15 times. I will not tell you to do that. You won't vote 15 times, but people will. They'll vote many times, and how that could have happened is unbelievable." (Gonski Decl. Ex. 18.)

1    During a speech given in Pennsylvania, Mr. Trump told attendees, "I hope you
2    people can sort of not just vote on the eighth [but] go around and look and watch other
3    polling places and make sure that it's 100 percent fine. . . . Go down to certain areas and
4    watch and study, make sure other people don't come in and vote five times." (Gonski
5    Decl. Ex. 11.) The following week, while exhorting followers to "go out and watch" for
6    voter fraud, Mr. Trump told attendees, "[a]nd when I say 'watch,' you know what I'm
7    talking about, right?" (Gonski Decl. Ex. 19.) In Michigan, the candidate told those
8    present to "[g]o to your place and vote, then go pick some other place, and go sit there
9    with friends and make sure it's on the up and up." (Gonski Decl. Ex. 20.)

10    Plaintiff introduced as evidence additional media reports that campaign
11    spokespersons were to emphasize talking points stating, among other things, "We have
12    []seen very significant recent voting irregularities across the country from Pennsylvania
13    to Colorado and an increase in unlawful voting by illegal immigrants"; "Non-citizen
14    votes may have been responsible for Barack Obama's narrow margin of victory in North
15    Carolina in 2008"; and, "More than 14 percent of non-citizens surveyed in 2008 and 2010
16    [] said they were registered to vote." (Gonski Decl. Ex. 10.)

17    Finally, Plaintiff provided pages from the Trump Campaign website where those
18    interested could "Volunteer to be a Trump Election Observer" to "Help [Trump] Stop
19    Crooked Hillary From Rigging This Election," which had fillable fields asking for an
20    entrant's name, contact information and date of birth. (Gonski Decl. Ex. 3.) From the
21    above statements, talking points and webpage, Plaintiff urges the conclusion that the
22    Trump Campaign has intimidated, threatened or coerced persons for voting, or attempts
23    to so intimidate, threaten or coerce such persons in violation of the Voting Rights Act.
24    Plaintiff also urges the conclusion that the Trump Campaign and its co-Defendants have
25    conspired to prevent voters from voting by intimidation or threat, or to injure them for
26    voting, in violation of the Ku Klux Klan Act.

27    Plaintiff's evidence regarding the Trump Campaign is insufficient to demonstrate
28    a likelihood of success on the merits of either its Voting Rights Act claim or its Ku Klux

- 15 -

Klan Act claim. First, at least some of the Trump Campaign's statements on which Plaintiff relies are taken out of context because they were abbreviated, and when considered in full, do not persuade at all that they evince an intent to intimidate voters, or to coordinate or conspire with others to deny the vote to anyone; nor when read in full would the statements have the effect of intimidating a voter. The quote that the campaign had "three major voter suppression operations underway," which Plaintiff summarizes as against Latinos, African Americans, and others, without more, leads a reader to conclude that the "suppression" referred to is to be achieved by denying the vote to certain groups, and that the only groups being "suppressed" are minority voters. A reading of the full text of the article provides a different meaning:

> "We have three major voter suppression operations under way," says a senior official. They're aimed at three groups Clinton needs to win overwhelmingly: idealistic white liberals, young women, and African Americans. Trump's invocation at the debate of Clinton's WikiLeaks e-mails and support for the Trans-Pacific Partnership was designed to turn off Sanders supporters. The parade of women who say they were sexually assaulted by Bill Clinton and harassed or threatened by Hillary is meant to undermine her appeal to young women. And her 1996 suggestion that some African American males are "super predators" is the basis of a below-the-radar effort to discourage infrequent black voters from showing up at the polls—particularly in Florida.

*Inside the Trump Bunker, With Days to Go*, Joshua Green and Sasha Issenberg, Bloomberg Business, October 27, 2016. The full text makes clear the speaker uses the word "suppression" to describe efforts to persuade voters not to vote for Hillary Clinton by pointing out issues on which the Trump Campaign believes her positions do not appeal to those voter demographic groups—not any effort to deny the vote by intimidation or otherwise. The quote also makes clear that the Trump Campaign is targeting its arguments against voting for Ms. Clinton to groups beyond minorities. The quotation from the unnamed campaign official is not persuasive of any element of proof required here.

Second, whether true or false, and whether appealing or repugnant to the listener, Mr. Trump's and his agents' statements that the election is rigged, that voter fraud is

being perpetrated *en masse* by "illegal aliens," and that his supporters should go to polls and watch to ensure a fair election, without more, simply do not prove actual or likely intimidation. One can seriously question the wisdom of stirring up supporters about a controversial issue, encouraging them to go to a precinct that is not their own, and telling them to look for "voter fraud" without defining what it is, leaving individuals to their own devices to figure out how to go about that task.[9] If the objective of observing is to detect persons voting more than once, the fact that the observer is in a precinct not their own, whether in the next town or the next state, only adds to the difficulty of recognizing a voter coming through the line more than once. And if the objective of observing, as strongly suggested by the candidate's statements, is to detect persons attempting to vote who are ineligible because they are not citizens, it is beyond question that no one can tell a person's citizenship based on what that person looks like or sounds like. But whatever the shortcomings of the Trump Campaign's statements on this issue might be, simply arguing there is voter fraud and urging people to watch out for it is not, without more, sufficient to justify the extraordinary relief that an injunction constitutes.

Plaintiff bears the burden of providing the evidence to take its claims from a nebulous concern over Defendants' statements, to a likelihood that the named Defendants and those acting in concert with them will intimidate, threaten, coerce, or attempt to intimidate, threaten or coerce, voters. Plaintiff has produced no evidence that anyone who signed up on the Trump Campaign website was ever contacted to follow up or connect them with a polling place. It produced no evidence that the Trump Campaign organized, trained or otherwise facilitated any volunteer's actual attendance at a polling place as an

---

[9] Indeed, among other evidence, Plaintiff produces a Tweet from a Trump supporter in Florida stating he planned to be "wear'n red at polls," "watch'n fer shenanigans," and "haul ya away," accompanied by a photo of a pickup truck and a person-sized cage built in the bed, surrounded by American flags. (Gonski Decl. Ex. 7.) An Ohio supporter stated, "it's called racial profiling. Mexicans. Syrians. People who can't speak American. I'm going to go right up behind them. I'll do everything legally. I want to see if they are accountable. I'm not going to do anything illegal. I'm going to make them a little bit nervous." (Gonski Decl. Ex. 6.) While these statements are deeply troubling, they do not illustrate an organized effort to intimidate voters in this jurisdiction, but rather appear to be outlier statements from other jurisdictions. Enjoining Defendants in this action is not likely to address those statements.

observer, in Arizona or elsewhere. It produced no evidence of any specific actions that observers would take, things they would say, or other facts that would allow the Court to evaluate whether such actions or statements could or would constitute intimidation, instead inviting the Court to conclude that the Trump Campaign's general exhortations to watch polling places is enough, and largely to speculate about what will come of them.

Plaintiff produced no evidence that the Trump Campaign had engaged in voter intimidation in Arizona in the past. And despite that early in-person voting has been ongoing in Arizona for over three weeks, it produced no evidence of any attempts at voter intimidation, or any voter reporting they felt intimidated, during this cycle. This places the instant case in vastly different territory than *Daschle v. Thune*, where, as discussed above, the court had before it concrete examples of voter intimidation by the defendants' supporters that had actually occurred during early voting, thus removing any air of speculation about likelihood of harm to voters or the plaintiff.[10]

Without any of these several types of evidence, the Court is unable to evaluate in any meaningful way the likelihood of the harm Plaintiff urges will occur in terms of actual or attempted voter intimidation as a result of the Trump Campaign's statements. For that reason, Plaintiff is unlikely to succeed on the merits of its Voting Rights Act claim. Nor is Plaintiff likely to succeed on the merits of its claim under the Ku Klux Klan Act, as it has not presented sufficient evidence of a conspiracy between the Trump Campaign and any co-Defendant to suppress votes in Arizona. As discussed above, the uncontroverted evidence at the hearing was that ARP did not communicate with the Trump Campaign on this topic and that the poll watching manual made available to all credentialed Republican poll watchers advises them not to contact voters directly and states that as a general matter, credentialed poll watchers do not challenge voters.

---

[10] The Court notes, as have other district courts considering similar matters, that should evidence arise on or before November 8, 2016, demonstrating harm or likelihood of harm as a result of Defendants' actions, it would entertain renewal of Plaintiff's Motion.

1    As for Defendants Stop the Steal and Mr. Stone, whatever communications may

2    occur between them and the Trump Campaign, Plaintiff has not produced evidence

3    sufficient to persuade the Court that they have conspired to intimidate voters, based on

4    the same analysis as above. The Court agrees with Plaintiff's counsel that it may make

5    inferences from what evidence exists. But at some point the inferences become so

6    attenuated as to be speculative. In the Court's judgment, based on the evidence before it,

7    the inferences necessary to reach a conclusion that there is a conspiracy to intimidate

8    voters have reached the point of speculation.

9                      **c.    Statements of Stop the Steal and Mr. Stone**

10   Plaintiff has proffered evidence that Stop the Steal's planned exit polling is

11   illegitimately designed to target Democratic-leaning and majority-minority districts,

12   rather than legitimate exit polling, which requires broad geographical distribution to

13   produce unbiased, reliable results. (Doc. 12, Mellman Report and Decl. at 1.) This may

14   be true. However, as Stop the Steal's counsel iterated, there is no requirement that exit

15   polls be scientific. (Tr. at 158-59 ("Stop the Steal isn't required to be scientific. It's not

16   even required to succeed. It may fail.").) Nor is Stop the Steal or Mr. Stone required to

17   operate a polling firm in order to conduct exit polling. There is no law or regulation

18   requiring any exit polling to be standardized, reliable, or to serve any purpose, much less

19   a legitimate one—only that it not serve an expressly illegitimate one. Therefore, it is not

20   for the Court to decide whether or not resultant information may be of use. Instead, the

21   Court must determine whether or not such activity, be it called "exit polling" or anything

22   else, violates voters' rights.

23   At base, Stop the Steal is not prohibited from conducting exit polling, so long as it

24   does so in accordance with all applicable laws and regulations. *See Daily Herald Co. v.*

25   *Munro*, 838 F.2d 380, 390 n.8 (9th Cir. 1988) (upholding District Court's finding that

26   exit polling did not interfere with citizens' right to vote without showing that polling was

27   disruptive, intended to interfere with any voter's rights, or that someone did not vote or

28   voted differently due to polling). Unscientific, targeted, unreliable, and even useless exit

polling, by itself, does not violate any voters' rights. Without a demonstration that Stop the Steal's planned exit polling is likely to intimidate, the Court may not enjoin it from conducting its polling. Plaintiff has failed to proffer any evidence that any voter is likely to be intimidated, threatened, or coerced due to the polling. Instead, Plaintiff offers conclusory statements based only on the purported motivation of Stop the Steal and its members. If Stop the Steal does intend to conduct its polling only at Democratic-leaning or majority-minority districts, its actions are facially suspicious. And neither Stop the Steal nor Mr. Stone have offered legitimate reasons for conducting polling in those targeted locations. But Plaintiff does not offer the vital evidentiary components that would allow the Court to infer likely or intended intimidation: precisely what Stop the Steal plans to do, where it plans to do it, how such conduct will intimidate voters, or even if the exit polling will ultimately occur. (Mellman Report and Decl. at 1.) The factually unsubstantiated, though informed, opinion of Plaintiff's expert does not obviate the need for further evidence of either Stop the Steal's alleged stratagem to intimidate non-white voters, or indeed any evidence of what Stop the Steal will do at the polls. Without such evidence, the Court cannot evaluate whether Stop the Steal's activities might constitute intimidation or not.

Plaintiff has also produced evidence that Stop the Steal and Mr. Stone recruited and mobilized groups of volunteers known as "vote protectors," who are encouraged to identify themselves as reporting for vote protectors, approach voters at the polls, and inquire about election fraud. (Gonski Decl. at Ex. 23; http://stopthesteal.org.) Plaintiff also alleges that Mr. Stone is using social media to urge potential uncredentialed observers to wear red shirts on Election Day. (Compl. ¶ 35.) However, there is no prohibition regarding the clothing of uncredentialed observers at polling locations, nor has Plaintiff provided any legal precedent holding that such activity is unconstitutional, likely to intimidate voters, or will otherwise hinder voter participation. Neither the encouragement of the activities alleged, nor the activities themselves are *per se*

prohibited. It is Plaintiff's burden to illustrate that these activities are likely to intimidate, threaten, or coerce voters. The evidence educed has failed to do so.

### 2.    Likelihood of Irreparable Harm

While a large portion of ARP and the Trump Campaign's brief focuses on what is purportedly the second part of the four-factor test (GOP Resp. at 4-7), they instead articulate that there is no evidence that the alleged harms have occurred or are likely to occur. This argument is properly placed in the first part of the four-factor test—likelihood of success on the merits. In analyzing the irreparable harm factor, the Court does not assess the likelihood that such harm will occur, but, if such harm does occur, whether it will be irreparable.

In doing so, it is clear that abridgement of the right to vote constitutes irreparable injury. *Reynolds v. Sims*, 377 U.S. 533, 562 (the right to vote is "a fundamental political right, because [it] is preservative of all rights"); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Cardona v. Oakland Unified Sch. Dist., California*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury."); *see also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury.") (internal citation omitted). Consequently, if potential members of the electorate suffer intimidation, threatening conduct, or coercion such that their right to vote freely is abridged, or altogether extinguished, Plaintiff would be irreparably harmed. Further, if some potential voters are improperly dissuaded from exercising their franchise, it is unlikely those voters can be identified, their votes cannot be recast, and no amount of traditional remedies such as money damages would suffice after the fact. This factor weighs in favor of a preliminary injunction.

### 3.      Balance of Equities and the Public Interest

Because Plaintiff brings this action not only on behalf of the Arizona Democratic Party, but also unidentified potential voters (*see, e.g.*, Mot. at 15-16), and ARP and the Trump Campaign purport to oppose the injunction due to its effect on unknown third-parties (GOP Resp. at 7-10), the Court will collapse the final two factors into a single category. *See Arizona Dream Act Coal. v. Brewer*, 818 F.3d 901, 920 (9th Cir. 2016) (analyzing both public interest and equities factors simultaneously); *Minard Run Oil Co. v. U.S. Forest Serv.,* 670 F.3d 236, 256 (3d Cir. 2011) ("we consider together the final two elements of the preliminary injunction framework—the public interest and the balance of the equities"); *Merced v. Spano*, No. 16CV3054 (SJ) (SMG), 2016 WL 3906646, at *2 (E.D.N.Y. July 14, 2016) ("The remaining elements (irreparable harm, balance of the equities and public interest) will be discussed together because in this instance, they are intertwined."). Analyzing factors three and four in unison, the Court must balance both Plaintiff's and the public's interest in protecting voters from undue influence, intimidation, or coercion, against Defendants' poll observing rights and right to free speech under the First Amendment.

As stated, the right to vote is a fundamental one, *Reynolds*, 377 at 562, the preservation of which is compelling. *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191 (1992). Indeed, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders¸* 376 U.S. 1, 17 (1964); *see also Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) ("There is no doubt that the right to vote is fundamental . . ."). The Supreme Court has consistently held that the states, too, have a compelling interest in maintaining the integrity of the voting place and preventing voter intimidation and confusion. *Burson v. Freeman*, 504 U.S. 191, 198 (1992); *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 229 (1989); *Anderson v. Celebrezze*, 460 U.S. 780 (1983). Accordingly, both Plaintiff and the public have a strong interest in allowing every registered voter to do so freely.

On the other hand, the Court acknowledges that Plaintiff's injunction, as requested, raises First Amendment concerns. Just as the right to vote is a fundamental one, so too is the right to political speech and the right to associate. *See, e.g.*, *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966) ("there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs . . . [including] discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes"); *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 146 (2d Cir. 2000) ("The right to political association also is at the core of the First Amendment, and even practices that only potentially threaten political association are highly suspect.")   (internal quotation and citation omitted). While the Court may only enjoin Defendants and their co-conspirators, if any, the injunction may nonetheless have a chilling effect on protected First Amendment speech by others. Indeed, Plaintiff has not provided the Court with a narrowly tailored injunction that would not unintentionally sweep within its ambit other activities that constitute exercise of freedom of speech. *See, e.g.¸ Rodriguez v. Robbins*, 715 F.3d 1127, 1133 (9th Cir. 2013) ("An overbroad injunction is an abuse of discretion."); *Union Pac. R. Co. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000) ("one basic principle built into Rule 65 is that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits") (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 444 (1974)); *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994) ("an injunction should not impose unnecessary burdens on lawful activity").

The Court also acknowledges that Plaintiff's requested injunction may further impinge on state-created rights or freedoms regarding poll observation. However, the injunction issued, if any, would only instruct both credentialed poll watchers and uncredentialed observers alike to follow the law as prescribed, and for any training given to credentialed poll watchers to similarly guide its trainees. Further, poll watching is not a

fundamental right that enjoys distinct First Amendment protection and it does not carry the same implications as the preceding rights. *See, e.g.*, *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007) ("poll watching is not incidental to this right and has no distinct First Amendment protection"); *Turner v. Cooper*, 583 F. Supp. 1160, 1161–62 (N.D. Ill. 1983) (holding that the act of poll watching is not protected by the First Amendment). Ultimately, each side implicates vital rights central to our system of government. Because the right to vote is sacrosanct and preservative of all other rights, the hardship balance and public interest factors weigh slightly in favor of granting Plaintiff's Motion.

## II.    CONCLUSION

The Court finds that Defendant Mr. Stone has sufficient contacts with Arizona and that Plaintiff's claims arise from those contacts, such that the Court has jurisdiction over Mr. Stone in this matter. The Court also finds that Plaintiff has not demonstrated it is likely to succeed in showing the statements and actions of Defendants to-date constitute intimidation, threat, coercion or force against voters for voting or attempting to vote in violation of the Voting Rights Act and/or the Ku Klux Klan Act. Moreover, Plaintiff has not shown the likelihood of a conspiracy as required for its Ku Klux Klan Act claim. Plaintiff is thus not likely to succeed on the merits for either of its claims against Defendants. Although Plaintiff has demonstrated (1) a likelihood of irreparable injury if Defendants violate the Voting Rights Act and/or the Ku Klux Klan Act prior to or on Election Day; (2) that the balance of equities tips slightly in its favor; and (3) that, in such an instance, an injunction would be in the public interest, the Court must deny Plaintiff's request for injunctive relief before Election Day based on the record before the Court. The parties may continue to raise issues to this Court through Election Day if they receive additional, material evidence.

**IT IS THEREFORE ORDERED** denying Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 10).

1     **IT IS FURTHER ORDERED** denying as moot Defendant Roger J. Stone, Jr.'s

2   oral motion to dismiss for lack of service and denying his oral motion to dismiss for lack

3   of jurisdiction (*see* Doc. 24; Doc. 25, Tr. at 43).

4     Dated this 4th day of November, 2016.

5

6

7                                                Honorable John J. Tuchi
                                                 United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NORTH CAROLINA DEMOCRATIC PARTY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:16-CV-1288 |
| NORTH CAROLINA REPUBLICAN PARTY, DONALD J. TRUMP FOR PRESIDENT, INC., ROGER J. STONE, JR., and STOP THE STEAL INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER

This matter is before the Court on a motion for temporary restraining order and/or preliminary injunction filed by the plaintiff North Carolina Democratic Party. (Doc. 4). The plaintiff contends that the defendants are acting in concert to disrupt the upcoming election by intimidating voters in violation of the Voting Rights Act and the Ku Klux Klan Act of 1871. The plaintiff seeks injunctive relief prohibiting the defendants from encouraging individuals to serve as unofficial poll watchers, from monitoring polling places, from gathering or loitering within 50 feet of a polling place, and from photographing or otherwise intimidating voters.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To prevail in the preliminary injunction motion, the plaintiff must demonstrate that (1) it is likely to succeed on the merits; (2) it will likely

suffer irreparable harm absent an injunction; (3) the balance of equities weighs in its favor; and (4) the injunction is in the public interest. *Id.* at 20.

Tomorrow, November 8, 2016, is Election Day, when voting will take place in North Carolina for the president, a United States senator, the governor, and numerous other public officials. The plaintiff has presented evidence that the defendants are each organizing or encouraging volunteers to go to polling locations in North Carolina for the ostensible purposes of identifying and stopping voting fraud and conducting exit polling. The plaintiff has presented evidence from which it asks the Court to infer that the real purpose and effect of these volunteer activities will be to intimidate minority voters.

While the statements of the defendant Roger Stone, the defendants' presidential nominee, and the nominee's surrogates, taken in context, may be susceptible to the interpretation that Mr. Stone and the Trump campaign are encouraging their supporters to intimidate voters, there is little evidence that supporters are acting on these indirect suggestions. There have been only a handful of hearsay reports that purported supporters of the defendants' presidential nominee may have threatened or intimidated voters in North Carolina during several weeks of early voting. The only evidence that the plaintiff has presented as to North Carolina are statements to news media by Mr. Stone that volunteers will conduct exit polling in Charlotte and Fayetteville, (Doc. 6-5 at 1); a report on a social media website that two supporters of the defendants' presidential nominee were seen near the Board of Elections office in Lee County with a baseball bat emblazoned with the nominee's name, (Doc. 6-30); and a handful of hearsay reports from a few counties that individuals purporting to be supporters of the defendants' presidential

2

nominee have harassed voters at early voting polling places.  (Doc. 8 at ¶¶ 3-9).  The Lee County incident has been explained under oath and does not appear to have been intimidating conduct.  (Doc. 11-1).  The only evidence that any of this conduct has intimidated a voter or suppressed the vote is a hearsay report that one voter in Wake County left a polling place without voting in order to avoid persons telling voters waiting in line to vote for the defendants' nominee "or else."  (Doc. 8 at ¶ 4).  While there are additional reports nationwide, the evidence of such troubling "outlier statements" in other states is not particularly indicative that intimidation will occur in North Carolina.  *See Ariz. Democratic Party v. Ariz. Republican Party*, No. 2:16-CV-3752, slip op. at 17 n.9 (D. Ariz. Nov. 4, 2016) (order denying preliminary injunction).

Even if all this evidence is credited, it is insufficient to establish a likelihood of success on the merits of the plaintiff's claims of a conspiracy by the defendants to train and encourage volunteers to intimidate voters in North Carolina.  Nor is it sufficient to establish the degree of irreparable harm required to obtain the broad injunctive relief the plaintiff seeks.

Moreover, these statements by the nominee and others are also susceptible to the interpretation that these defendants are encouraging their supporters to report potential voter fraud.  There is nothing inherently intimidating about persons observing spaces outside polling places and reporting possible fraud to appropriate officials or to a hotline in a peaceful, non-threatening, and non-disruptive manner.  Supporters of particular candidates have long been allowed to encourage persons coming to the polls to vote a particular way, subject to reasonable space restrictions applicable to all.  Trust and

confidence in election results is important, and restricting persons supporting one candidate or party from access to spaces near polling sites when there is not substantial evidence that the persons will act to or have been trained or encouraged to intimidate voters is not conducive to such trust and confidence and raises significant First Amendment concerns.  Intimidation of voters, intentional or otherwise, is already against the law, and persons violating those laws are already subject to criminal prosecution and civil damages.

That said, voters are entitled to cast their ballots without fear of reprisal or threat of physical harm.  *See* 52 U.S.C. § 10307(b) (making it illegal for any person, "whether acting under color of law or otherwise," to "intimidate, threaten, or coerce . . . any person for voting"); 42 U.S.C. § 1985(3).  On Election Day, if it becomes apparent that agents of any defendant or supporters encouraged by any defendant are making an effort to intimidate minority voters or to further incite intimidation of voters, the plaintiff may renew the motion.

It is **ORDERED** that the plaintiff's motion for a temporary restraining order and/or preliminary injunction, (Doc. 4), is **DENIED**, without prejudice should circumstances change.

This the 7th day of November, 2016.

UNITED STATES DISTRICT JUDGE

4